Nos. 15-1112, 15-1209

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

### NATIONAL LABOR RELATIONS BOARD
**Petitioner/Cross-Respondent**

**and**

### NATIONAL ASSOCIATION OF BROADCAST EMPLOYEES AND TECHNICIANS - COMMUNICATIONS WORKERS OF AMERICA, LOCAL UNION NO. 11; NATIONAL ASSOCIATION OF BROADCAST EMPLOYEES AND TECHNICIANS - COMMUNICATIONS WORKERS OF AMERICA, LOCAL UNION NO. 31
**Intervenors**

**v.**

### CNN AMERICA, INC.
**Respondent/Cross-Petitioner**

———————————

## ON APPLICATION FOR ENFORCEMENT AND CROSS-PETITION FOR REVIEW OF AN ORDER OF THE NATIONAL LABOR RELATIONS BOARD

———————————

## BRIEF FOR THE NATIONAL LABOR RELATIONS BOARD

———————————

**JOAN E. HOYTE**
*Supervisory Attorney*

***National Labor Relations Board***
**1015 Half Street, SE**
**Washington, DC 20570**
**(202) 273-1793**

**RICHARD F. GRIFFIN, JR.**
*General Counsel*
**JENNIFER ABRUZZO**
*Deputy General Counsel*
**JOHN H. FERGUSON**
*Associate General Counsel*
**LINDA DREEBEN**
*Deputy Associate General Counsel*

**National Labor Relations Board**

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

Pursuant to Rule 28(a)(1) of this Court, counsel for the National Labor Relations Board ("the Board") certify the following:

A. ***Parties, Intervenors, and Amici***:  The Board is the Petitioner/Cross Respondent before the Court; its General Counsel was a party before the Board. National Association of Broadcast Employees and Technicians, Communications Workers of America, Local Union Nos. 11 and 31, were the charging parties before the Board, and have intervened in support of the Board.  CNN America, Inc., is the Respondent/Cross-Petitioner before the Court, and was the respondent before the Board.  Joint amici curiae Chamber of Commerce of the United States of America, Coalition for a Democratic Workplace, International Franchise Association, National Federation of Independent Business, National Association of Manufacturers, and National Restaurant Association have filed a brief in support of CNN.

B. ***Ruling Under Review***:  The ruling under review is a Decision and Order the Board in CNN America, Inc., 361 NLRB No. 47 (September 15, 2014), and corrected by 362 NLRB No. 38 (March 20, 2015).

C. ***Related Cases***:  The case was not previously before this Court or any other court.  Board counsel is unaware of any related cases.

/s/ Linda Dreeben
Linda Dreeben
Deputy Associate General Counsel
NATIONAL LABOR RELATIONS BOARD
1015 Half Street SE
Washington, D.C. 20570

Dated at Washington, D.C.
this 8th day of April 2016

# TABLE OF CONTENTS

**Headings**                                                                 **Page(s)**

Statement of jurisdiction ..................................................................2

Statement of the issues ...................................................................3

Relevant statutory provisions.........................................................3

Statement of the case......................................................................4

I.  The Board's findings of fact ....................................................4

CNN contracts for technical services at its DC and NYC bureaus; TVS is created exclusively for that purpose; CNN terminates TVS's contracts and employees.......4

II.  The Board's conclusions and order ........................................5

Summary of argument.....................................................................7

Standard of review .........................................................................9

Argument.......................................................................................10

   I.    Substantial evidence supports the board's finding that CNN and TVS were joint employers ......................................................10

        A. Joint-employer principles.................................................11

        B. CNN's extensive involvement in TVS's employment matters demonstrates its joint-employer status ...............................12

            1.  Hiring and staffing .................................................12

            2.  Hours and overtime.................................................14

            3.  Assignments............................................................15

            4.  Direction and supervision .......................................18

            5.  Wages and collective bargaining ............................19

# **TABLE OF CONTENTS**

**Headings-Cont'd**                                                                                           **Page(s)**

      6. Discipline ...............................................................................23

      7. Other factors...........................................................................24

   C. CNN's defenses to the joint-employer finding lack merit .................27

      1. The Board applied the correct joint-employer analysis............27

      2. The Board did not retroactively apply *BFI II* ...........................30

      3. The Board gave proper weight to the joint-employer factors......................................................................................31

      4. The Board properly rejected CNN's claim that its lack of participation in the Union's prior certification negates joint-employer status ........................................................................34

II.  Substantial evidence supports the Board's finding that CNN violated Section 8(a)(3), (5) and (1) by terminating its unionized employees and failing to bargain over that decision and its effects .....................................................36

   A. CNN terminated the ENGAs and TVS technicians to avoid union-contract obligations ..............................................................................36

      1. Principles governing union-related discrimination...................36

      2. Facts related to CNN's unlawful termination of the ENGAs ....................................................................................37

      3. Substantial evidence supports the Board's finding that CNN terminated the ENGAs to avoid union obligations...................41

      4. CNN's defense is pretextual .....................................................43

   B. CNN violated Section 8(a)(5) and (1) by refusing to bargain over the decision to terminate the TVS ENGAs and employees and the effects of that decision .....................................................................................44

## **TABLE OF CONTENTS**

**Headings-Cont'd**                                                                       **Page(s)**

III.  Substantial evidence supports the Board's findings that CNN violated
      Section 8(a)(3) and (1) by discriminatorily failing to hire terminated
      TVS employees to avoid successorship obligations, Section 8(a)(1) by
      making coercive statements, and Section 8(a)(5) and (1) by refusing to
      recognize and bargain with the Union and unilaterally setting employment
      terms ................................................................................................46

      A. Successor employers' statutory obligations .......................................46

      B. CNN plans and implements its BSP recruitment in a manner that
         discriminated against terminated TVS employees ............................48

         1.  Manipulation of job descriptions ...............................................49

         2.  CNN's antiunion statements violated Section 8(a)(1) and
             showed animus .........................................................................51

         3.  Inconsistent and discriminatory application of "behavioral
             interviewing" guidelines in the BSP's hiring decisions ..........53

         4.  CNN's explanation of its BSP is pretext .................................58

         5.  CNN's claims regarding its hiring lack merit ..........................60

      C. The Board reasonably found that CNN was a successor employer and
         therefore violated Section 8(a)(5) and (1) of the Act by refusing to
         recognize and bargain with the Union and by unilaterally changing
         extant employment terms ...................................................................64

         1.  CNN was a successor under *Burns* ..........................................64

         2.  CNN was not entitled unilaterally to set initial terms and
             conditions of employment because it discriminated against
             hiring its predecessor's employees ..........................................68

IV.   The Board acted within its broad remedial discretion in issuing its
      order ................................................................................................70

# <u>TABLE OF CONTENTS</u>

**Headings-Cont'd**                                                              **Page(s)**

    A. The Board properly ordered CNN to reinstate terminated TVS
       employees and restore their employment terms...................................70

    B. CNN has not met its heavy burden of showing that the Board abused
       its broad remedial discretion ..............................................................72

    C. Changed circumstances do not invalidate the Board's affirmative
       bargaining order .................................................................................75

Conclusion ...................................................................................................77

iv

# TABLE OF AUTHORITIES

**Cases**                                                                                           **Page(s)**

*Advanced Stretchforming Int'l, Inc.*,
  323 NLRB 529 (1997), *enforced*,
  208 F.3d 801 (9th Cir.), *amended and superseded on reh'g*,
  233 F.3d 1176 (9th Cir. 2000) ........................................................................ 53, 68

*Airborne Express*,
  338 NLRB 597 (2002) ................................................................. 27, 28, 29, 30, 31

*\*Aldworth Co.*,
  338 NLRB 137 (2000) ......................................................................... 11, 28

*AM Property Holding Co.*,
  350 NLRB 998 (2007) ......................................................................... 29

*American Air Filter Co.*,
  258 NLRB 49 (1981) ......................................................................... 44

*Assoc. Press v. NLRB*,
  301 U.S. 103 (1937) ......................................................................... 75

*Auciello Iron Works, Inc. v. NLRB*,
  517 U.S. 781 (1996) ......................................................................... 76

*Bally's Park Place, Inc. v. NLRB*,
  646 F.3d 929 (D.C. Cir. 2011) ......................................................................... 10

*Banknote Corp. of Am. v. NLRB*,
  84 F.3d 637 (2d Cir. 1996) ......................................................................... 69

*Bay Shipping Corp.*,
  263 NLRB 1133 (1982), *enforced*,
  721 F.2d 187 (7th Cir. 1983) ......................................................................... 67

_____

\* Authorities upon which we chiefly rely are marked with asterisks.

# TABLE OF AUTHORITIES

**Cases-Cont'd**                                                                 **Page(s)**

*Boire v. Greyhound Corp.,*
  376 U.S. 473 (1964)......................................................................... 12

*Bremerton Sun Publ'g Co.,*
  311 NLRB 467 (1993) ..................................................................... 67

*Browning-Ferris Industries of California, Inc.,*
  362 NLRB No. 186 (2015) .......................................................... 30, 31

*Bruce Packing Co. v. NLRB,*
  795 F.3d 18 (D.C. Cir. 2015)........................................................... 44

*Capital Cleaning Contractors, Inc. v. NLRB,*
  147 F.3d 999 (D.C. Cir. 1998)........................................... 47, 68, 72, 73

*Carrier Corp. v. NLRB,*
  768 F.2d 778 (6th Cir. 1985) ........................................................... 28

*Chelsea Indus., Inc. v. NLRB,*
  285 F.3d 1073 (D.C. Cir. 2002).......................................................... 9

*Co. v. NLRB,*
  418 F.2d 127 (5th Cir. 1969)........................................................... 11

*Comar, Inc. v. NLRB,*
  111 F. App'x 1 (D.C. Cir. 2004) ...................................................... 67

*Computer Associates International, Inc. v. NLRB,*
  282 F.3d 849 (D.C. Cir. 2002) .................................................... 34-35

*\*D&F Indus.,*
  339 NLRB 618 (2003) .............................................................. 11, 15

---

\* Authorities upon which we chiefly rely are marked with asterisks.

vi

## TABLE OF AUTHORITIES

**Cases - Cont'd**                                                    **Page(s)**

*D & S Leasing, Inc.*,
  299 NLRB 658 (1990), *enforced sub nom.*,
*NLRB v. Centra, Inc.,* 954 F.2d 366 (6th Cir. 1992) ............................ 19, 21, 45, 74

*\*Daufuskie Island Club & Resort, Inc.*,
  328 NLRB 415 (1999), *enforced sub nom.*,
  *Int'l Union of Oper. Eng. v. NLRB*, 221 F.3d 196 (D.C. Cir. 2000)................... 71

*\*DiMucci Const. Co. v. NLRB,*
  24 F.3d 949 (7th Cir. 1994) .......................................................................... 11, 15

*\*Dodge of Naperville, Inc. v. NLRB,*
  796 F.3d 31 (D.C. Cir. 2015).................................................................... 45, 66, 67

*\*Dunkin' Donuts Mid-Atlantic Distrib. Ctr. v. NLRB,*
  363 F.3d 437 (D.C. Cir. 2004).................. 11, 12, 13, 17, 18, 19, 20, 24, 27, 28, 33

*Dynair Servs.*,
  314 NLRB 161 (1994) ........................................................................................ 35

*\*Elastic Stop Nut v. NLRB,*
  921 F.2d 1275 (D.C. Cir. 1990).................................................... 37, 47, 48, 63, 65

*Exxon Chem. Co. v. NLRB,*
  386 F.3d 1160 (D.C. Cir. 2004)........................................................................... 44

*\*Fall River Dyeing & Finishing Corp. v. NLRB,*
  482 U.S. 27 (1987)................................................................................... 46, 48, 65

*FES (Div. of Thermo Power),*
  331 NLRB 9 (2000), *enforced*,
  301 F.3d 83 (3d Cir. 2002).................................................................................. *62*

_____

\* Authorities upon which we chiefly rely are marked with asterisks.

# TABLE OF AUTHORITIES

**Cases - Cont'd**                                                       **Page(s)**

*Flagstaff Medical Ctr.*,
  357 NLRB No. 65 (2011), *enforced in part*,
  715 F.3d 928 (D.C. Cir. 2013) ............................................................ 29

*Flamingo Hilton-Laughlin v. NLRB*,
  148 F.3d 1166 (D.C. Cir. 1998) ........................................................ 75

*\*G. Heileman Brewing Co.*,
  290 NLRB 991 (1988), *enforced*,
  879 F.2d 1526 (7th Cir. 1989) ........................................................... 25

*\*G. Heileman Brewing Co. v. NLRB*,
  879 F.2d 1526 (7th Cir. 1989) ............................................ 44, 71, 72, 73

*GFS Bldg. Maint.*,
  330 NLRB 747 (2000) ....................................................................... 42

*Goodyear Tire & Rubber Co.*,
  312 NLRB 674 (1993) ................................................................... 12, 34

*\*Great Lakes Chem. Corp. v. NLRB*,
  967 F.2d 624 (D.C. Cir. 1992) ........................................... 47, 57, 71, 74

*\*Harvey Aluminum, Inc.*,
  147 NLRB 1287 (1964) ................................................................ 11, 13, 27

*Holyoke Visiting Nurses Association*,
  310 NLRB 684 (1993), *enforced*,
  11 F.3d 302 (1st Cir. 1993) .............................................................. 33

*\*Holyoke Visiting Nurses Assn. v. NLRB*,
  11 F.3d 302 (1st Cir. 1993) ............................................................ 11, 25

_____

\* Authorities upon which we chiefly rely are marked with asterisks.

## TABLE OF AUTHORITIES

**Cases - Cont'd**                                                      **Page(s)**

*Howard Johnson Co. v. Hotel Employees,*
  417 U.S. 249 (1974) ................................................................ 47

*Hugh H. Wilson Corp. v. NLRB,*
  414 F.2d 1345 (3d Cir. 1969) ................................................ 37

*Int'l Union of Oper. Eng. v. NLRB,*
  221 F.3d 1996 (2000) ............................................................ 71

*\*Inova Health Sys. v. NLRB,*
  795 F.3d 68 (D.C. Cir. 2015) ...................................... 9, 10, 53

*Justak Bros. & Co. v. NLRB,*
  664 F.2d 1074 (7th Cir. 1981) .............................................. 37

*Kallmann v. NLRB,*
  640 F.2d 1094 (9th Cir. 1981) .............................................. 68

*Ken Maddox Heating & Air Conditioning, Inc.,*
  340 NLRB 43 (2003) .............................................................. 58

*KJAZ Broadcasting Co.,*
  272 NLRB 196 (1984) ............................................................ 67

*Laerco Transp.,*
  269 NLRB 324 (1984) ............................................................ 28

*\*Laro Maint. Corp. v. NLRB,*
  56 F.3d 224 (D.C. Cir. 1995) ........................................ 10, 47, 63

*\*Love's Barbeque Rest.,*
  245 NLRB 78 (1979), *enforced in relevant part, sub nom.,*
   *Kallmann v. NLRB*, 640 F.2d 1094 (9th Cir. 1981) ........................... 68

_____

\* Authorities upon which we chiefly rely are marked with asterisks.

# TABLE OF AUTHORITIES

**Cases - Cont'd**                                                      **Page(s)**

*Lucky Cab Co.*,
  360 NLRB No. 43 (2014)........................................................ 43

*Master Sec. Servs.*,
  270 NLRB 543 (1984) .......................................................... 61

*McClatchy Newspapers, Inc. v. NLRB*,
  131 F.3d 1026 (D.C. Cir. 1997)............................................ 52

*Metro. Edison Co. v. NLRB*,
  460 U.S. 693 (1983)............................................................. 36

*Micro Pacific Dev., Inc. v. NLRB*,
  178 F.3d 1325 (D.C. Cir. 1999)............................................ 35

*Midwest Television, Inc.*,
  343 NLRB 748 (2004) .......................................................... 30

*Mingo Logan Coal Co. v. NLRB*,
  67 F. App'x 178 (4th Cir. 2003)........................................... 24

*Mobil Oil Corp.*,
  219 NLRB 511 (1975) .......................................................... 11

*N. Michigan Bldg. & Const. Trades Council v. NLRB*,
  243 F. App'x 898 (6th Cir. 2007) ........................................ 63

*New Breed Leasing Corp. v. NLRB*,
  111 F.3d 1460 (9th Cir. 1997)............................................. 47

_____

\* Authorities upon which we chiefly rely are marked with asterisks.

## <u>TABLE OF AUTHORITIES</u>

**Cases-Cont'd**                                                                         **Page(s)**

*New Process Steel, L.P. v. NLRB,*
  560 U.S. 674 (2010) ................................................................. 29

*\*NLRB v. Browning-Ferris Indus.,*
  691 F.2d 1117 (3d Cir. 1982) ..................................... 11, 26, 28, 33-34

*\*NLRB v. Burns Security Services*,
  406 U.S. 272 (1972) .............................................. 46, 65, 68

*\*NLRB v. Centra, Inc.,*
  954 F.2d 366 (6th Cir. 1992) ............................. 19, 42, 45, 73

*NLRB v. Creative Food Design Ltd.,*
  852 F.2d 1295 (D.C. Cir. 1988) ................................... 48

*\*NLRB v. Katz,*
  369 U.S. 736 (1962) ............................................... 45

*\*NLRB v. Katz's Delicatessen of Houston Street, Inc.,*
  80 F.3d 755 (2d Cir. 1996) ...................................... 72

*NLRB v. Link-Belt Co.,*
  311 U.S. 584 (1955) ............................................... 61

*\*NLRB v. Staten-Island Hotel Ltd. Partnership,*
  101 F.3d 858 (2d Cir. 1996) .................................. 48, 76

*\*NLRB v. Transp. Mgmt. Corp.,*
  462 U.S. 393(1983) ............................................ 36, 37

*NLRB v. W.C. Nabors,*
  196 F.2d 272 (5th Cir. 1952) .................................... 61

---

* Authorities upon which we chiefly rely are marked with asterisks.

## <u>TABLE OF AUTHORITIES</u>

**Cases‑Cont'd**                                                       **Page(s)**

*NLRB v. Western Temp. Servs., Inc.,*
  821 F.2d 1258 (7th Cir. 1987) .................................................. 11, 14, 76

*O.G.S. Tech.*,
  356 NLRB 642 ..................................................................................... 59

*Painting Co.,*
  330 NLRB 1000 (2000), *enforced,*
  298 F.3d 492 (6th Cir. 2002)........................................................ 24, 25

*Passaic Daily News v. NLRB,*
   736 F.2d 1543 (D.C. Cir. 1984) ........................................................ 75

*Planned Building Services, Inc.,*
   347 NLRB 670 (2006), *overruled on other grounds*,
   *Pressman Cleaners*, 361 NLRB No. 133 (2014) ...................... 62-63, 73

*Quantum Resources Corp.*,
   305 NLRB 759 (1991)  .............................................................. 15, 20

*Ref-Chem Co. v. NLRB,*
   418 F.2d 127 (5th Cir. 1969) ............................................................ 11

*Regal Cinemas, Inc. v. NLRB,*
   317 F.3d 300 (D.C. Cir. 2003)............................................. 45, 70, 72

*Serramonte Oldsmobile v. NLRB,*
   86 F.3d 227 (D.C. Cir. 1996)............................................................. 67

*Smoke House Rest.*,
   347 NLRB 192 (2006) ...................................................................... 64

_____

\* Authorities upon which we chiefly rely are marked with asterisks.

xii

# TABLE OF AUTHORITIES

**Cases – Cont'd**                                                                **Page(s)**

*Southern California Gas,*
  302 NLRB 456 (1991) ................................................................... *32*

*\*Southwest Merch. Corp. v. NLRB,*
  53 F.3d 1334 (D.C. Cir. 1995) ........................................................ 62

*Summit Express, Inc.,*
  350 NLRB 592 (2007) ................................................................... 29

*\*Sun-Maid Growers of Calif. v. NLRB,*
  618 F.2d 56 (9th Cir. 1980) ........................................................... 15

*Tambe Electric, Inc.,*
  346 NLRB 380, 382 (2006) ............................................................ 58

*\*Tasty Baking Co. v. NLRB,*
  254 F.3d 114 (D.C. Cir. 2001) ........................................................ 37

*\*Teamsters Local No. 171 v. NLRB,*
  863 F.2d 946 (D.C. Cir. 1988) ................................................... 71, 75

*\*Texas World Servs. Co. v. NLRB,*
  928 F.2d 1426 (5th Cir. 1991) ................................. 12, 14, 20, 21, 22, 26, 28, 36

*TIC-The Industrial Co. v. NLRB,*
  126 F.3d 334 (D.C. Cir. 1997) ........................................................ 53

*TLI, Inc.,*
  271 NLRB 798 (1984), *enforced,*
  772 F.2d 894 (3d Cir. 1985) ....................................................... 28,30

_____

\* Authorities upon which we chiefly rely are marked with asterisks.

## <u>TABLE OF AUTHORITIES</u>

**Cases - Cont'd**                                                                                          **Page(s)**

*Traction Wholesale Ctr. v. NLRB,*
  216 F.3d 92 (D.C. Cir. 2000)................................................................ 10

*\*Trident Seafoods, Inc. v. NLRB,*
  101 F.3d 111 (D.C. Cir. 1996)................................................ 66, 68, 69

*\*U.S. Marine Corp.,*
  293 NLRB 669, 670 (1989), *enforced*,
  944 F.2d 1305 (7th Cir. 1991) ...................................................... 69,70

*\*U.S. Marine Corp. v. NLRB,*
  944 F.2d 1305 (7th Cir. 1991) ............................................................ 48

*\*Universal Camera Corp. v. NLRB,*
  340 U.S. 474 (1951).................................................................. 10, 12

*Value Village,*
  161 NLRB 603 (1966) ...................................................................... 11

*\*Virginia Elec. & Power Co. v. NLRB,*
  319 U.S. 533 (1943).......................................................................... 71

*Volair Contractors, Inc.,*
  341 NLRB 673 (2004) ...................................................................... 61

*\*W & M Prop. of Conn., Inc. v. NLRB,*
  514 F.3d 1341 (D.C. Cir. 2008)........................................................ 63

*\*Waterbury Hotel Mgmt., LLC v. NLRB,*
  314 F.3d 645 (D.C. Cir. 2003) .................................................... 62, 63

_____

\* Authorities upon which we chiefly rely are marked with asterisks.

xiv

## <u>TABLE OF AUTHORITIES</u>

**Cases-Cont'd**                                                  **Page(s)**

*Whitewood Oriental Maint. Co.*,
  292 NLRB 1159 (1989) .............................................................. 24, 26

*Wiers Int'l Trucks, Inc.*,
  353 NLRB 475 (2008) ...................................................... 29

*Williams Enters., Inc. v. NRLB*,
  956 F.2d 1226 (D.C. Cir. 1992)...................................... 51, 52

*WLNE –TV ,*
  259 NLRB 1224 (1982).................................................. 67

*Wright Line*,
  251 NLRB 1083 (1980), *enforced*,
  662 F.2d 899 (1st Cir. 1981)) .......................... 37, 47, 62, 63

*Zurn/N.E.P.C.O.*,
  345 NLRB 12, 15, 19 (2005).......................................... 63

_____

\* Authorities upon which we chiefly rely are marked with asterisks.

# <u>TABLE OF AUTHORITIES</u>

**Statutes:**                                                                                **Page(s)**

National Labor Relations Act, as amended
  (29 U.S.C. § 151 et seq.)

Section 7 (29 U.S.C. § 157) ....................................................... 7, 36, 42, 51, 52, 76

Section 8(a)(1) (29 U.S.C. § 158(a)(1))................3, 6, 36, 44-48, 51, 52, 64, 65, 69

Section 8(a)(3) (29 U.S.C. § 158(a)(3))............................................. 3, 6, 36, 46, 69

Section 8(a)(5) (29 U.S.C. § 158(a)(5))...........................3, 6, 35, 36, 44-48, 64, 65

Section 10(a) (29 U.S.C. § 160(a)) ....................................................................... 2

Section 10(e) (29 U.S.C. § 160(e)) .................................................................... 2, 3

Section 10(f) (29 U.S.C. § 160(f)) ..................................................................... 2, 3

————————————————

\* Authorities upon which we chiefly rely are marked with asterisks.

# GLOSSARY

Act ……………………..The National Labor Relations Act (29 U.S.C. §§ 151
                         *et seq.*)

*BFI I*.……………………*NLRB v. Browning-Ferris Industries,* 691 F.2d 1117
                         (3d Cir. 1982)

*BFI II*…………………...*Browning-Ferris Industries of California, Inc.*, 362
                         NLRB No. 186 (2015), *pet. for review pending* (D.C. Cir.
                         Nos. 16-1028 & 16-1064).

*BSP……………………..CNN's Bureau Staffing Project

*DC……………………..CNN's news bureau in Washington, DC

*ENGAs………….…...Electronic News Gathering Service Agreements

*NYC…………………...CNN's news bureau in New York, NY

*PQs …………………….Position Questionnaires

*TVS……………………Team Video Services, LLC and Team Video Services
                          of New York

*Union……………………National Association of Broadcast Employees and
                           Technicians - Communications Workers of America,
                           Local Union Nos. 11 and 31

---

* Acronyms marked with asterisks are abbreviated as such in the Board's brief to
conform to the terminology in the Board's Decision and Order.

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

—————————————

### Nos.  15-1112, 15-1209

—————————————

### NATIONAL LABOR RELATIONS BOARD
**Petitioner/Cross-Respondent**

### and

### NATIONAL ASSOCIATION OF BROADCAST EMPLOYEES AND TECHNICIANS - COMMUNICATIONS WORKERS OF AMERICA, LOCAL UNION NO. 11; NATIONAL ASSOCIATION OF BROADCAST EMPLOYEES AND TECHNICIANS - COMMUNICATIONS WORKERS OF AMERICA, LOCAL UNION NO. 31
**Intervenors**

### v.

### CNN AMERICA, INC.
**Respondent/Cross-Petitioner**

—————————————

## ON APPLICATION FOR ENFORCEMENT AND
## CROSS-PETITION FOR REVIEW OF AN
## ORDER OF THE NATIONAL LABOR RELATIONS BOARD

—————————————

## BRIEF FOR
## THE NATIONAL LABOR RELATIONS BOARD

—————————————

## STATEMENT OF JURISDICTION

This case is before the Court on the application of the National Labor Relations Board for enforcement, and the cross-petition of CNN America, Inc. for review, of a Board Order against CNN.  National Association of Broadcast Employees and Technicians, Communications Workers of America, Local Union Nos. 11 and 31 ("Local 11," and "Local 31," or collectively "the Union"), the charging parties before the Board, have intervened in support of the Board.

The Board had jurisdiction over the unfair-labor-practice proceeding below under Section 10(a) of the National Labor Relations Act, as amended ("the Act").[1] The Decision and Order, which issued on September 15, 2014 (361 NLRB No. 47), and was corrected on March 20, 2015 (362 NLRB No. 38),[2] is a final order under Section 10(e) and (f) of the Act.[3]

The Board applied for enforcement on April 22, 2015, and CNN cross-petitioned for review on July 9; both were timely as the Act imposes no time limits

---

[1] 29 U.S.C. §160(a).

[2] References in this brief are to the Board's Decision and Order ("D&O"); Order on Motion for Reconsideration ("Reconsid.Ord."); the transcript from the hearing before the administrative law judge ("Tr."); the General Counsel's, CNN's, and the Union's exhibits, ("GCX, CNNX, and UX," respectively); and CNN's and the Amici's briefs to the Court ("Br." and "ABr.", respectively).  References preceding a semicolon are to the Board's findings; those following are to the supporting evidence.

[3] 29 U.S.C. §160(e),(f).

2

for such filings.  The Court has jurisdiction pursuant to Section 10(e) and (f) of the Act.[4]

## STATEMENT OF THE ISSUES

1.  Whether substantial evidence supports the Board's finding that CNN and its contractor Team Video Services, LLC ("TVS") were joint employers?

2.  Whether substantial evidence supports the Board's finding that, as a joint employer, CNN violated Section 8(a)(3), (5) and (1) of the Act by terminating its contract with TVS and its unionized employees and failing to bargain over that decision and its effects?

3.  Whether substantial evidence supports the Board's finding that, as a joint employer, CNN violated Section 8(a)(3) and (1) of the Act by discriminatorily failing to hire terminated TVS employees to avoid successorship obligations, Section 8(a)(1) by making coercive statements, and Section 8(a)(5) and (1) by refusing to recognize and bargain with the Union and unilaterally setting employment terms?

4.  Whether the Board acted within its broad remedial discretion in issuing its Order?

## RELEVANT STATUORY PROVISIONS

Relevant statutory provisions are in the attached addendum.

---

[4] *Id.*

## STATEMENT OF THE CASE

On charges filed by the Union, the Board's General Counsel issued a consolidated complaint alleging that CNN committed numerous unfair labor practices.  Following an 82-day hearing, an administrative law judge issued a decision and recommended order finding that CNN had violated the Act as alleged.  Finding no merit to CNN's exceptions, the Board affirmed the judge's findings with some modifications in reasoning and to the recommended order.  (D&O 1-129.)

Given the scope of the violations found, word-count constraints, and a desire to avoid repetition, the facts of each contested issue are summarized in the relevant Argument sections.  Background facts are covered next.

## I.    THE BOARD'S FINDINGS OF FACTS

### CNN Contracts For Technical Services at its DC and NYC Bureaus; TVS is Created Exclusively for that Purpose; CNN Terminates TVS's Contracts and Employees

Since 1980 and 1985, when CNN opened its news bureaus in Washington ("DC") and New York ("NYC"), it awarded Electronic News Gathering Service Agreements ("ENGAs" or "contracts") to a series of companies to supply the technical employees who operated, installed, and maintained the electronic equipment.  (D&O 1;GCX 40.)  In 1982, the Board certified Local 31 as the collective-bargaining representative for the DC employees.  In 1985, the Board

4

certified Local 11 as the NYC collective-bargaining representative.  (D&O 1,49-50;GCX 2,10.)  In both bureaus, unit employees include field, studio and control room camera operators and technicians; audio and lighting technicians; engineers; and couriers.  (D&O 49-50.)  Each subsequent contractor hired the predecessor's employees and recognized, bargained, and signed collective-bargaining agreements with the Union.  (D&O 1-2.)

In 1997 in DC, and 2001 in NYC, CNN invited Asgard Entertainment Group, Inc., a DC-based television-and-film-production enterprise, to submit bids and awarded it both ENGAs.  Asgard created TVS solely to administer the ENGAs.  (D&O 1-2,53 n.11;Tr. 347,369,1032,15161-67,GCX70,70(a),40.)  TVS hired 90-95% of its predecessor's technicians.  (D&O 2.)  As described more fully below (pp. 12-24), CNN was heavily involved in many aspects of TVS employees' working conditions including hiring, hours, assignments, direction, discipline, and compensation.  (D&O 3-7.)  In December 2003 and mid-January 2004, CNN terminated the ENGAs and the TVS employees, and brought in-house the technical work that they had performed.  (D&O 9-10.)  TVS ceased operations and dissolved.  (D&O 1,53 n.11;Tr. 347,369.)

## II.    THE BOARD'S CONCLUSIONS AND ORDER

The Board (Chairman Pearce and Member Hirozawa, Member Miscimarra dissenting), affirmed the judge's findings that:  (1) CNN and TVS were joint

employers; (2) CNN was obligated to comply with the terms of the collective-bargaining agreements between TVS and the Union, and that CNN's failure to do so violated Section 8(a)(5) and (1) the Act; (3) CNN violated Section 8(a)(3) and (1) of the Act by terminating the ENGAs and unit employees because of union animus; and (4) CNN violated Section 8(a)(5) and (1) by failing to bargain with the Union about the decision to terminate the ENGAs and the effects of that decision.  (D&O 24.)

The Board (Chairman Pearce, Members Hirozawa and Miscimarra) affirmed the judge's findings that CNN became a successor employer upon its insourcing of the contracted work and that its subsequent failure to recognize and bargain with the Union, and its unilateral changes in employment terms, violated Section 8(a)(5) and (1) of the Act.  The Board (Member Miscimarra dissenting) also found that, as a successor, CNN violated Section 8(a)(3) and (1) by discriminatorily implementing a hiring plan to limit the number of TVS employees in order to avoid its successorship bargaining obligation.  Finally, the Board unanimously affirmed the judge's finding that TVS shift supervisors were bargaining-unit employees, not statutory supervisors,[5] and that CNN violated Section 8(a)(1) by making various "no-union" statements (Member Miscimarra dissented regarding one such statement).  (D&O 21-24.)

---

[5] CNN does not contest this finding.

6

The Board's Order requires CNN to cease and desist from the violations found and from, in any like or related manner, interfering with, restraining, or coercing employees in the exercise of their Section 7 rights.  Affirmatively, the Order requires that CNN:  recognize and bargain in good faith with the Union and embody any understanding reached in a signed agreement; revoke any unilateral changes, and restore the preexisting terms and conditions of employment until it negotiates in good faith with the Union to agreement or to impasse; restore any unit work that has been outsourced; and remit, with interest, any dues owed under the most recent collective-bargaining agreements.  The Order further requires that CNN:  reinstate and make employees whole for wages and benefits lost due to the unfair labor practices; and provide any necessary training to perform their former jobs or substantially equivalent positions; remove from the discriminatees' files any reference to the unlawful discharges or refusals to hire; and post and electronically distribute remedial notices.  (D&O 24-28.)

## SUMMARY OF THE ARGUMENT

CNN implemented a two-pronged approach to rid itself of union obligations. First, it fired the unionized technicians it jointly employed.  Then it refused to hire 100+ former employees by disadvantaging them in the hiring process.  CNN's union animus was transparent as it repeatedly stated that there would be no union.

7

As joint and successor employers, CNN refused to bargain with the Union throughout the unlawful series of events.

1.     Ample evidence supports the Board's finding that CNN jointly employed the TVS technicians. It co-determined key employment terms including hiring, staffing, hours, assignments, supervision and direction, wages, and discipline. Ignoring those facts, CNN wrongly claims that the Board misapplied the joint-employer standard.

2.     CNN unlawfully terminated the TVS subcontracts and employees to evade union-related constraints regarding labor costs, assignments, freelancers, and staffing. It explicitly crafted the photojournalist job description to avoid union jurisdiction. When CNN announced TVS's termination, it repeatedly praised unit employees for their excellent work. The same day, however, it unlawfully stated that it had to "get rid of" TVS and its employees because of union rules and that there would be "no union" and "no role for the Union" at CNN.

3.     CNN further violated the Act when it refused to hire 100+ TVS employees to avoid the bargaining obligations of a successor employer. While it hired some TVS employees to keep its production running, CNN rejected 100+ others. Again, its words—including stating that a TVS employee would not freelance for CNN because of his union relationship—and actions demonstrate its unlawful motive. CNN manipulated job requirements to minimize the abilities of

8

TVS applicants and counterintuitively gave no weight to their experience.  CNN touts an objective hiring process and asserts that it favored TVS employees; the record shows otherwise.  Non-TVS applicants received CNN's patronage including hiring shortcuts, interview preferences, exemption from requirements for "growth" candidates, unsolicited CNN-management recommendations, raised rankings, and disregard of negative references.  TVS applicants had no such benefits and jumped through every hiring hoop, but were rejected despite uniformly positive references.  CNN's claim that technological and production changes demanded terminating and not hiring TVS employees is pretext.  They had always effectively adapted to such changes.  When CNN implemented similar changes at other (nonunion) bureaus the incumbent staff stayed.

4.     Lastly, the Board's remedy simply restores the status quo before CNN's many violations destroyed employees' livelihoods.  Its invocation of their statutory rights, which it trampled, as a defense is disingenuous.

## STANDARD OF REVIEW

This Court's review of the Board decisions "is tightly cabined and [it] afford[s] the Board a high degree of deference."[6]  It will "defer to the Board's interpretation of the Act if it is reasonable."[7]  The Board's factual findings and its

---

[6] *Inova Health Sys. v. NLRB*, 795 F.3d 68, 80 (D.C. Cir. 2015) (internal quotation omitted).
[7] *Chelsea Indus., Inc. v. NLRB*, 285 F.3d 1073, 1075 (D.C. Cir. 2002).

application of the law to particular facts are conclusive if supported by substantial evidence on the record as a whole. [8] "Indeed, the Board is to be reversed only when the record is so compelling that no reasonable factfinder could fail to find to the contrary."[9] Put differently, the Court will not "displace the Board's choice between two fairly conflicting views of the facts, even though the court would justifiably have made a different choice had the matter been before it *de novo*."[10]

This Court is "even more deferential when reviewing the Board's conclusions regarding discriminatory motive, because most evidence of motive is circumstantial."[11] Given the Board's expertise in this area, the Court "gives substantial deference to inferences" the Board draws from facts, including motive.[12] Moreover, the Court will accept the Board's credibility determinations unless they are "patently insupportable."[13]

## ARGUMENT

## I. SUBSTANTIAL EVIDENCE SUPPORTS THE BOARD'S FINDING THAT CNN AND TVS WERE JOINT EMPLOYERS

The Board found that CNN and TVS were joint employers of the DC and NYC technical employees. As shown below, this finding is supported by

---

[8] *Traction Wholesale Ctr. v. NLRB*, 216 F.3d 92, 99 (D.C. Cir. 2000).
[9] *Bally's Park Place, Inc. v. NLRB*, 646 F.3d 929, 935 (D.C. Cir. 2011).
[10] *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951).
[11] *Inova Health Sys.*, 795 F.3d at 80.
[12] *Laro Maint. Corp. v. NLRB*, 56 F.3d 224, 229 (D.C. Cir. 1995).
[13] *Inova Health Sys.*, 795 F.3d at 80.

substantial evidence and consistent with Board and Court precedent.  Moreover, because CNN was a joint employer, it is was required to comply with the collective-bargaining agreements between TVS and the Union.

### A.    Joint-Employer Principles

For over three decades, the Board and courts have held that "two separate entities may be joint employers of 'a single workforce if they share or co-determine those matters governing the essential terms and conditions of employment.'"[14]  Among the indicia that the Board and courts have found probative are meaningful control over or participation in:  hiring;[15] determining the number of workers to be supplied;[16] setting or approving wages rates and overtime;[17] assignment and day-to-day supervision and direction;[18] and at-will termination of the contractual agreement.[19]  Moreover, the "period surrounding the

---

[14] *See Dunkin' Donuts Mid-Atlantic Distrib. Ctr. v. NLRB*, 363 F.3d 437, 440 (D.C. Cir. 2004) (quoting *NLRB v. Browning-Ferris Indus.*, 691 F.2d 1117, 1123, 1124 (3d Cir. 1982) ("*BFI I*")), *enforcing Aldworth Co.*, 338 NLRB 137 (2000).

[15] *Ref-Chem Co. v. NLRB*, 418 F.2d 127, 129 (5th Cir. 1969).

[16] *Harvey Aluminum, Inc.*, 147 NLRB 1287, 1289 (1964).

[17] *Aldworth Co.,* 338 NLRB at 137; *NLRB v. Western Temp. Servs., Inc.*, 821 F.2d 1258, 1267 (7th Cir. 1987); *Ref-Chem Co.*, 418 F.2d at 129; *D&F Indus.*, *Inc*., 339 NLRB 618, 640 (2003).

[18] *Holyoke Visiting Nurses Assn. v. NLRB*, 11 F.3d 302, 306 (1st Cir. 1993); *DiMucci Const. Co. v. NLRB*, 24 F.3d 949, 953 (7th Cir. 1994).

[19] *Value Village*, 161 NLRB 603, 607 (1966); *Mobil Oil Corp.*, 219 NLRB 511, 516 (1975).

11

unfair labor practices" determines joint-employer status.[20]

The Board's determination of joint-employer status is "essentially a factual issue" to be decided on the totality of the circumstances.[21]  It is sustained if supported by substantial evidence.[22]  As shown below, the evidence amply supports the Board's finding (D&O 3 & n.7,6,8 n.21) that CNN was a joint employer with TVS, because it was "intimately involved in practically every important aspect of the employment relationship between TVS and its employees" and "played a direct and key role in some events" that the Board ultimately found to be unlawful.

### B.   CNN's Extensive Involvement in TVS's Employment Matters Demonstrates Its Joint-Employer Status

#### 1.   Hiring and staffing

CNN constrained TVS's hiring and staffing choices.  CNN's policy, per the ENGAs and its handbook, barred TVS from hiring any technicians who worked for CNN's competitors.  TVS told the Union that although TVS did not have its own no outside-employment policy, it enforced CNN's policy.  (D&O 3 & n.8;Tr.

---

[20] *Goodyear Tire & Rubber Co.*, 312 NLRB 674, 676 (1993); *accord Texas World Servs. Co. v. NLRB*, 928 F.2d 1426, 1432 (5th Cir. 1991).

[21] *Boire v. Greyhound Corp.*, 376 U.S. 473, 481 (1964).

[22] *Universal Camera*, 340 U.S. at 487-88; *Dunkin' Donuts*, 363 F.3d at 441.

249,GCX 40.)  The Board and this Court have found such hiring constraints to support joint-employer status.[23]

In addition, the ENGAs granted CNN "the right to require changes in TVS staffing levels and to negotiate with TVS to adjust the number of technicians" retained.  (D&O 2,3;GCX 40.)  All of TVS's staffing-level changes were demanded by CNN.  (D&O 3;Tr. 15234-35,15244-46,15250,GCX 40-583,592.) For example, in late 2001, CNN told TVS to reduce the number of technicians in DC.  (D&O 3;Tr. 3462-63.)  Similarly, in 2003, CNN sought to increase the "number of staff" to expand the shows in NYC.  TVS complied.  (Tr. 15244-45,GCX 592.)  In rejecting the Union's proposal to expand and rotate the technicians assigned to the White House, TVS stated that "CNN is opposed to expanding the crew[s]," and "TVS would comply with whatever [] CNN wanted…."  (Tr. 1127,1130,1133,1426-27,1435.)

Per the ENGAs' requirement, TVS obtained CNN's approval before hiring additional technicians even to cover for sick or vacationing employees and to handle overflow work.  (D&O 2,3;Tr. 15364,GCX 40.)  On those occasions, CNN routinely directed TVS to hire nonunion freelancers, thereby reducing overtime for unit employees.  When that practice led to a stalemate in DC collective-bargaining

---

[23] *See Dunkin' Donuts*, 363 F.3d at 440 (preventing hiring of applicants that putative employer did not approve); *Harvey Aluminum*, 147 NLRB at 1289 (requiring contractor not to employ any worker with "conflict[ing]" employment).

13

negotiations, CNN authorized TVS to agree to the Union's proposal limiting freelancers. TVS did so. (D&O 3;Tr. 4331-32,4947-50,5447-48,5451,5454.) Such control over hiring and staffing demonstrates joint-employer status.[24]

## 2. Hours and overtime

CNN's control over TVS employees' hours and overtime was similarly stringent. The ENGAs dictated that full-time employees must be available at least 40 hours a week, and that part-time employees must be available "for fewer hours, on a 24-hour a day, 7 days a week basis, as needed by CNN." (D&O 3;GCX 40.) Combined with other provisions requiring "top priority" to CNN's work and barring outside employment, CNN expressly, and by implication, controlled unit employees' hours. (Tr. 249-50,4739,GCX 40.)

CNN's control of overtime was particularly rigorous. TVS could not assign overtime without CNN's approval, and CNN required daily overtime reports. (D&O 3 & n.9; Tr. 8322-24, 11280,GCX 40,421,422.) TVS closely adhered to CNN's other overtime requirements, implementing, for instance, CNN's direction to reduce a particular technician's overtime because CNN "could do whatever it wanted." (D&O 3-4;Tr. 7483-89,7615-18,11280.) Conversely, CNN frequently assigned employees time-sensitive overtime work without notifying TVS. (Tr.

---

[24] *See Western Temp.*, 821 F.2d at 1266 (influence over hiring); *Texas World Servs.*, 928 F.2d at 1433 (same).

8862,8959-60.)  Moreover, when TVS refused to pay an engineer for an overtime assignment because it had no advance notice, a CNN manager interceded and TVS paid the engineer.  (D&O 3 & n.9;Tr. 8869-71,8949.)  Such control over hours and overtime shows CNN's joint-employer status.[25]

### 3.    Assignments

CNN directly assigned TVS employees on a regular basis and for breaking news.  CNN generated "daily rundowns" listing each story, location, date, time, duration, the CNN correspondent/reporter, the number of field technicians, and necessary equipment.  Typically, TVS added the specific technicians for the assignments.  (D&O 3;Tr. 3770-72,4479-98,10177-18,11236,15330-34.)  Even so, TVS routinely complied with CNN's requests for specific technicians.  (Tr. 442-44,3762-65,3770-72,4140-42,5160,5166-68,9009-10,9046-47,9051,9070,9935-37,15303-04,15362-63,15368-69.)  CNN's frequent requests for specific technicians caused "drastic fluctuations" in studio and control-room schedules.  (D&O 4;Tr. 442-44,9009-10,9046-47,9051,9070,9932-35,10033-34,15362-63,15368-69.)  For example, CNN selected a particular DC cameraman to cover

---

[25] *See D&F Indus., Inc.*, 339 NLRB at 640; *Quantum Resources Corp.*, 305 NLRB 759, 760-61 (1991) (control over regular and overtime hours of subcontractor's employees); *see generally Sun-Maid Growers of Calif. v. NLRB*, 618 F.2d 56, 58 (9th Cir. 1980) (putative joint employer delivered production schedules, assigned work, decided priorities, changed employees' hours, decided overtime and additional staffing).

the 1997 and 1998 State of the Union addresses and for the weekly show "Saturday Edition." (Tr. 5160,5166-68). On several occasions, CNN directors for the "Wolf Blitzer Reports" and "Late Edition" directly called technicians who were out sick and told them to come in. (D&O 4;Tr. 13689-90,13701,13720-21,14104-12,14315,14119,14320-21.) Those frequent assignment changes were a "bone of contention" for studio and control-room employees; invariably TVS responded that CNN could make those changes as the client. (D&O 4;Tr. 9935-37.)

At both bureaus, CNN and TVS assignment personnel shared a single desk. When the TVS personnel were absent or uninformed about specific assignments, CNN personnel gave the technicians their assignments. (D&O 4;Tr. 3574,6812-13,6915,6978, 8853-56,9519-20,CNNX 83.) Occasionally, TVS reassigned employees after CNN complained they had been misassigned. (CNNX 83,Tr. 6814-15, 6981-82,15362-63.)

CNN's assignment of employees was particularly pronounced for breaking-news coverage. (D&O 4;Tr. 3574,4748,5045-46,6095,6181,6457,10033-34.) For example, in July 1998, a CNN producer directed a TVS cameraman to cover the shooting of Capitol Hill police officers. (D&O 4;Tr. 6817.) On 9/11, CNN assigned two DC employees to NYC but then quickly reassigned them to cover the Pentagon incident. (D&O 4;Tr. 6278-80.) In February 2003, CNN directly called a DC cameraman on his day off, and ordered him to cover the Space Shuttle

16

Columbia disaster.  (D&O 4;Tr. 7522-25,7528-29,7640.)  In the latter two situations, those employees remained on the assignments for several days without contacting TVS.  (D&O 5;Tr. 6280-81.)  This Court has found that control over contractor's employees in emergencies demonstrates joint-employer status.[26]

At CNN's satellite or field locations—such as at Capitol Hill, the White House, United Nations, and New York Stock Exchange—where no TVS supervisors were present—CNN producers gave technicians their daily assignments.  (D&O 4 n.12;Tr. 977-721,1628-35,1683,6465-66,7628-30,7923,14167-97,14233-34.)  So exclusive was CNN's control over those employees that it determined which four White House technicians would cover President Clinton's 1998 trip to Africa for almost 2 weeks without seeking TVS's approval.  (D&O 4;Tr. 1677-80;GCX 132,133.)  And, when a cameraman worked on a long-term assignment at CNN en Español, CNN repeatedly denied TVS's requests for his services, even during his downtime.  (D&O 4 n.13,55 n.18;Tr. 7520-21,7640-42.)

Likewise, CNN managers assigned engineers without even informing TVS.  (Tr. 7664-65.)  For example, CNN's engineering director called DC engineers at home for computer/IT help, emailed them assignments, and assigned them

---

[26] *See Dunkin' Donuts*, 363 F.3d at 440.

overtime, without seeking TVS's approval.  The director's control of their assignments was so consistent that the engineers considered him their "ultimate boss."  (Tr. 2309,2888-89, 2963-94,3015-16,3306-11.)  Such involvement in assignments indicates joint-employer status.[27]

### 4.    Direction and supervision

CNN had virtually total control over the day-to-day direction and supervision of TVS technicians.  (D&O 4,5,53 n.11,55,103;Tr. 6805-06,6820,6793-95,6797-801.)  This was particularly true for field technicians who worked in 1-or-2-man crews, sometimes accompanied by a CNN reporter or director, but never by a TVS supervisor.  (Tr. 1633-35,1683,1755-57,1832-35,4142-43,7010,7182-83,7193,7628-30,7923,11548-50.)  As noted above, no TVS supervisors or managers worked at the satellite locations where many field technicians worked on long-term assignments.  (Tr. 2630,6084,6465-66,6797-801,6805-07,6820,9763-64,9794,9815,10750-54,13518-21.)

The studio and control-room technicians worked under the constant direction and supervision of CNN's producers and directors, who provided instructions regarding camera placement, lighting, color and sound, timing of video footage, and pulling and putting on tapes.  (D&O 5;Tr. 4894-905,5398-99,5400,5480-

---

[27] *See id.*

18

81,13727.)  Although TVS managers were present daily, they admittedly "never

told the [studio or] control room technicians what to do."  (Tr. 5073,10184.)  For

example, on the "American Morning" show, despite TVS's operations manager's

presence, he "had no responsibility during the live broadcast," even if problems

arose.  (D&O 5;Tr. 11788,11791-93,11817-18.)  Similarly, the engineers received

all their "person-to-person directions" on such tasks as how to pull cables, wire,

and install equipment, from CNN's engineering directors.  (D&O 5;Tr. 1735-

38,2646-49,2651-53,2663,2707-09,2786-88,2840,3000-01,3183-89,3206-

11,3312,3316-19,3353-56,5223,14185-86,14338-39.)  This level of direction of

TVS employees shows CNN's joint-employer status.[28]

### 5.    Wages and collective bargaining

One of "the most important terms and conditions of employment from the

employees' viewpoint [is] wages."[29]  Accordingly, the Board finds joint-employer

status where "the entity that contracted for labor dictated what wage employees

would receive."[30]  Here, the Board found (D&O 6-7) that CNN possessed and

---

[28] *See id.* at 440-41 (day-to-day direction of the leased employees); *D & S Leasing, Inc.*, 299 NLRB 658, 659 (1990) (same), *enforced sub nom. NLRB v. Centra, Inc.*, 954 F.2d 366 (6th Cir. 1994).

[29] *See D & S Leasing*, 299 NLRB at 672.

[30] *Id.*; *see also Dunkin' Donuts*, 363 F.3d at 441 (evidence of joint-employer status included specifying employee wage and benefits in the parties' cost-plus agreement and rates [putative employer] would reimburse contractor, discontinuing employee bonus program, and determining whether drivers received incentive

exercised meaningful control over TVS technicians' wage rates via direct

constraints on wages through the ENGAs' labor cost provisions and its

involvement in collective-bargaining negotiations.

CNN advised TVS to "evaluate the market rates of salaries" and to offer

wage rates competitive with its main rival, FOX News, which had recruited some

of the predecessor contractor's "very good" engineers.  (D&O 6 n.16;Tr. 15170-

71.)  Based on CNN's advice, TVS paid the most experienced technicians higher-

than-union wage rates as an incentive to keep them from leaving.  (Tr. 609,3618.)[31]

CNN had the right under the ENGAs to decide the wage rates that TVS paid

for nonunion part-time technicians, overtime assignments, travel expenses, and

meal penalties.  Wielding its control, CNN consistently complained about overtime

costs and required TVS to hire independent contractors/freelancers, who earned

below union-scale wages, to fill staffing gaps.  (Tr. 1127,1130,1133,1426-27,

1435.)  The ENGAs also provided that CNN would deposit into TVS's merit-pay

account an additional 2% of payroll wages and taxes, and specified that CNN

would allow TVS to increase by up to 4% annually employees' regular pay.  In

addition, the ENGAs reserved to CNN the right to audit TVS's payroll

---

award); *Quantum Resources*, 305 NLRB at 760 (control over wage and benefit rates).

[31] *See Dunkin' Donuts*, 363 F.3d at 441 (client for labor services "developed, in significant part, the rating categories used to determine whether employees received incentive awards"); *Texas World Servs*., 928 F.2d at 1434 (indirect assistance and "promising [employees] better wages").

expenditures without cause or notice.  (D&O 6;GCX 40.)

Involvement in the collective-bargaining process also indicates joint-employer status.[32]  CNN exercised meaningful control over wage rates and other issues in the TVS-Union negotiations.  When the 1997-98 DC contract negotiations stalemated because TVS's wage-increase proposals stayed within the ENGAs' 4% constraint while the Union proposed 4.5%, TVS explained to the Union that it "had to speak to our people in Atlanta [CNN's headquarters] on the financial impact proposals."  (D&O 6;Tr. 3560, 3561-62,4939-40.)  After receiving CNN's approval, TVS accepted the Union's offer.  (Tr. 472-74,3391-92,15251-52.)  Contract negotiations wrapped up quickly when a union steward identified the sticking point—an independent-contractor proposal—to CNN's DC bureau chief, who asked what was delaying ratification.  TVS promptly withdrew that proposal, and the parties reached an agreement.  (D&O 3;Tr. 4331-32,4947-50,5447-48,5451,5454.)

Internal documents show CNN's integral involvement in the 2002 DC collective-bargaining negotiations.  In March 2002, TVS emailed CNN an "update" on the stalled negotiations with the parties' positions on "the key issues," including wages and cost-of-living increases, vehicle insurance, seniority, work-schedule changes, and the probationary period.  The email said: "[w]e need

---

[32] *See Texas World Serv.*, 928 F.2d at 1434; *D & S Leasing*, 299 NLRB at 660, 672.

guidance on the cost of living increases," "[l]et me know how you want us to proceed" on the vehicle-insurance proposal, and "[h]ow do you see us handling potential increases in health insurance and other related benefits[.]  We need to finalize our negotiations on this so that we can factor our arrangement into the [Union] negotiations."  (D&O 5;Tr. 15253-55,GCX 593.)  Moreover, at a bargaining session, in response to union frustration over the pace of negotiations and inquiry about why CNN was not at the table since the employees worked for CNN, TVS's counsel responded, "I represent CNN."  (D&O 68 n.19;Tr. 4951,5453-55.)  Such a representation is indicative of a joint employer.[33]

During the 2002-03 NYC bargaining sessions, TVS informed the Union that its "parameters of any wage proposal are limited by its subcontract with CNN." (Tr. 282.)  The parties were stuck on wages and health-insurance benefits.  TVS consulted with and obtained CNN's permission to amend TVS's offer on the two issues.  (Tr. 10606-08,10635-36.)  When the parties reached a tentative agreement, TVS informed the Union that it "had to take [the agreement] to the TVS board and CNN" for approval.  (Tr. 10636.)  CNN's deep involvement in TVS's union negotiations amply shows its joint-employer status.[34]

---

[33] *See Texas World Serv.*, 928 F.2d at 1433 (contractor's agent represented himself to employees and other third parties as representative of putative employer).

[34] *See id.* (indirect assistance or involvement in collective-bargaining process).

### 6.    Discipline

CNN effectively initiated unit employees' discipline and discharge by reporting misconduct to TVS managers and, at times, specifically demanding what discipline should be meted out.  (D&O 5 n.15.)  For example, when a NYC technician brought an unauthorized person to the facility, CNN demanded that TVS discharge him despite a TVS-Union grievance settlement that allowed him to keep his job (and attend counseling) or resign with $5,000 in severance.  CNN also told TVS to ensure that he could not collect unemployment benefits and to pay him only a fraction ($1,500) of the agreed-upon severance.  TVS complied with all CNN directives, the prior settlement notwithstanding.  (D&O 5 n.15;Tr. 250-53,10603-05,10630-32,CNNX 359.)

Two other incidents show CNN's control over discipline.  First, when CNN Operations Manager Sweet ordered TVS employee Mosley to "take his feet off the furniture and pay close attention" to work, Mosley replied that he did not work for Sweet; Sweet retorted, "[i]ndirectly you do."  Sweet reported Mosley to TVS. Without any investigation, TVS issued Mosley a written warning and 2-day suspension, recounting verbatim Sweet's account.  TVS also removed Mosley from his shift supervisory position for 2 weeks, which forfeited his premium pay. (Tr. 5084-87,15372-73;GCX 311, 312.)  Second, when the Union asked TVS to delay an employee's termination, TVS said that CNN wanted the employee fired,

and that when "CNN wants somebody -- they want him fired today."  (Tr. 4286-

87,4289-90,4798-99.)  CNN's direction of discipline, including termination,

clearly demonstrates its joint-employer status.[35]

### 7.    Other factors

Other evidence supports the Board's finding (D&O 53) that the CNN/TVS

relationship was not a "typical" arms-length contractor/subcontractor situation "in

which the subcontractor performs a particular task" by dispatching employees

using the subcontractor's equipment from its own off-site premises.[36]  As

discussed above (p.5), TVS was created essentially at CNN's invitation, and

existed solely and explicitly to provide employees for CNN's use.  In response to

unit employees' complaints about CNN's interference in their day-to-day affairs,

TVS simply responded that CNN was the client and could do what it wanted.  And,

ultimately, TVS ceased operations immediately upon CNN's termination of the

ENGAs.  (Tr. 6590-99,7489,9935-37,GCX 102(F).)  Such a one-way relationship

---

[35] *See Dunkin' Donuts*, 363 F.3d at 441 (influence over discipline and firing
decisions); *Whitewood Oriental Maint. Co*., 292 NLRB 1159, 1161 (1989) (same);
*see also Mingo Logan Coal Co. v. NLRB*, 67 F. App'x 178, 186 (4th Cir. 2003)
(effective recommendation of discipline).
[36] *See Painting Co.,* 330 NLRB 1000, 1007 (2000) ("In the typical
contractor/subcontractor situation, the subcontractor undertakes to perform a
particular task …. [and] ordinarily provides at least some of the equipment and
materials needed to do the job."), *enforced* 298 F.3d 492 (6th Cir. 2002).

indicates joint-employer status.[37]

In addition, occasionally, both CNN and TVS newsroom employees were required to attend CNN's mandatory employee meetings.  (Tr. 5113-14,5210,5215.)   Similarly, TVS conducted joint training for CNN and TVS employees on such topics as safe operations of the microwave truck and, after 9/11, proper gas-mask usage.  (Tr. 5266-67,5215-17.)  CNN and TVS employees both used CNN's lockers and break and supply rooms, and attended the same holiday celebrations.  (Tr. 5218,5221-22.)

CNN held out the TVS technicians as its own employees, which is indicative of joint employment.[38]  For example, a CNN 9/11 documentary, broadcast worldwide on the CNN/Turner network, featured a TVS field technician, whom it identified as "Brian Keiderling/CNN Videographer."  (D&O 7 fn.18;Tr. 10017-20,GCX 492,494,495.)  CNN's applications for U.S. Secret Service credentials for TVS technicians listed "CNN/TVS" as the employer.  (Tr. 6165-67,6383-86,8518-19,8597-8700,8667-68,8874,10133-34,GCX 337,433A-B,446,497.)  The security clearances, press passes, and identification badges that CNN obtained and required

---

[37] *See id.* (contractor treated arrangement as one in which subcontractor's sole purpose was to provide employees for its use); *G. Heileman Brewing Co.*, 290 NLRB 991, 999-1000 (1988) (contracted work essential to putative employer's production operations), *enforced*, 879 F.2d 1526 (7th Cir. 1989).

[38] *See Holyoke Visiting Nurses Ass'n*, 11 F.3d at 306 (contractor's employees regarded as putative employer's employees).

the TVS field technicians to wear were identical to those worn by CNN's own reporters and producers.  (D&O 7;Tr. 1642-45,6485-86,8622,9773,GCX 131A-K, 345,346,347,433A,433B,462-465.)  Board law is clear that requiring a subcontractor's employees to wear the general contractor's identification indicates joint-employer status.[39]

Finally, CNN provided TVS with space, infrastructure, and equipment.  And for business transactions, it permitted TVS to use stationery bearing its logo superimposed above its bureau address.  (D&O 7;GCX 41-42,53,61-64,69.) Common use of stationery also indicates joint employment.[40]  CNN managers had TVS email addresses and, for some time, TVS technicians had email accounts on the CNN/Turner system.  (D&O 7;Tr. 2890-91,8879-90,8978-79,8998-99,9635,16273-75.)  Indeed, the Turner/CNN NYC information office emailed all TVS technicians about CNN's 2004 health-insurance open enrollment and a CNN-sponsored behavioral-health and wellness workshop.  (Tr. 8883-84,GCX 447,448.) On TVS's intranet bulletin board, CNN posted a memo announcing its new dress code for TVS technicians working at the White House and complimentary letters about unit employees' work.  (Tr. 5178-79,5191,5199,5443.)  And CNN supplied

---

[39] See *BFI I*, 691 F.2d 1117, 1125 (3d Cir. 1982) (wearing putative joint employer's uniforms); *Whitewood Oriental Maint. Co.*, 292 NLRB at 1162 (1989) (putative employer's badges).

[40] *See BFI I*, 691 F.2d at 1125 (use of putative employer's stationery for recordkeeping purposes); *Texas World Serv.*, 928 F.2d at 1433 (stationery with putative joint employer's address for business transactions).

TVS technicians with equipment and corresponding training. Such factors support joint-employer status.[41] Moreover, the Board found (D&O 3;7) that CNN's joint-employer liability is further supported by its direct role in committing numerous unfair labor practices against unit employees.[42]

Based on the overwhelming credited evidence, the Board reasonably found that CNN exercised significant control over the essential terms and conditions of TVS employees' jobs and therefore was a joint employer of the TVS employees.

### C.    CNN's Defenses to the Joint-Employer Finding Lack Merit

#### 1.    The Board applied the correct joint-employer analysis

Both CNN (Br. 31-40) and the Amici (ABr. 5-20) criticize the Board's joint-employer finding for failing to apply the correct standard. Citing *Airborne Express*,[43] they argue (Br. 26,31-34,43,45,ABr. 5-8,14) that "the established legal standard in place at the time" of the Board's decision was "whether a putative joint employer's control over employment matters is 'direct and immediate.'" Simply put, they mischaracterize the extant law and joint-employer analysis consistently applied by the Board.

---

[41] *See Harvey Aluminum*, 147 NLRB at 1289 (putative joint employer owned buildings, tools, and materials used by subcontractor, whose sole business was making products for putative joint employer); *Dunkin' Donuts*, 363 F.3d at 440 (supplying contractor's employees with equipment).

[42] *See Dunkin' Donuts*, 363 F.3d at 441 (putative employer also "played a key role in some of the events that the Board ultimately found to be unfair labor practices").

[43] 338 NLRB 597, 597 n.1 (2002).

For over three decades, the Board, with court approval, has adhered to the standard established in *NLRB v. Browning-Ferris Industries* ("*BFI I*")[44]—namely that "two separate entities are joint employers if they 'share or codetermine those matters governing the essential terms and conditions of employment,'"[45] in a manner that "meaningfully affects matters relating to the employment relationship such as hiring, firing, discipline, supervision, and direction."[46]  Indeed, this Court has endorsed the Board's analysis, and has explained that "the relevant facts involved in this determination [of joint-employer status] extend to nearly every aspect of employees' terms and conditions of employment and must be given weight commensurate with their significance to employees' work life."[47]

Here, the Board expressly applied that well-settled standard and found (D&O 3 & n.7,6-8 & n.21) that CNN was a joint employer because it was "intimately involved in practically every important aspect of the employment relationship between TVS and its employees."  In addition, it "played a direct and key role" in the unfair labor practices, which this Court considers relevant.[48]

---

[44] 691 F.2d 1117 (3d Cir. 1982).

[45] *TLI, Inc.*, 271 NLRB 798, 798 (1984) (quoting *BFI I*, 691 F.2d at 1123-14), *enforced* 772 F.2d 894 (3d Cir. 1985); *accord Dunkin' Donuts*, 363 F.3d at 440; *Airborne Express*, 338 NLRB at 597 n.1; *Carrier Corp. v. NLRB*, 768 F.2d 778, 781 (6th Cir. 1985); *Texas World Serv.*, 928 F.2d at 1434.

[46] *Laerco Transp.*, 269 NLRB 324, 325 (1984).

[47] *Aldworth*, 338 NLRB at 139.

[48] *See Dunkin' Donuts*, 363 F.3d at 441.

CNN and the Amici have little support for their position that *Airborne*, with its use of "direct and immediate control" terminology, was the controlling joint-employer standard. First, while *Airborne* states that direct-and-immediate control is "an essential element"[49] of joint employment that terminology has not been treated as providing the standard for determining joint-employer status. Indeed, no court has cited it, nor has any Board decision turned on that "direct-and-immediate" language or even treated it as an "essential element."[50] Even the two post-*Airborne* cases CNN relies on (Br. 32) do not cite it. And, in those cases, the evidence showed far less control by the alleged joint employer compared with CNN's significant control over TVS employees per the ENGAs and in practice.[51] CNN's pre-*Airborne* case citations (Br. 32) also do not use the "direct and immediate" terminology. Because joint-employer status turns on the facts of each

---

[49] 338 NLRB at 597 n.1 (emphasis added).

[50] Even Board cases that cite *Airborne* do not explicitly determine direct-and-immediate control in assessing whether joint employment existed. *See AM Property Holding Co.*, 350 NLRB 998, 1002 (2007) (finding evidence "insufficient to establish" putative employer "meaningfully affect[ed] matters relating to employment relationship"); *Wiers Int'l Trucks, Inc.*, 353 NLRB 475, 475 n.5, 488 (2008) (two-member Board, which Supreme Court later found lacked a quorum under *New Process Steel, L.P. v. NLRB*, 560 U.S. 674 (2010), found no joint employment; putative joint employer "had no role whatsoever in the management, operation, or control").

[51] *Summit Express, Inc.*, 350 NLRB 592, n.3, 618 (2007) (contract did not grant putative joint employer direct control over employment terms and contractor free to change employment terms); *Flagstaff Medical Ctr.*, 357 NLRB No. 65, slip op. 11 (2011) (putative joint employer "play[ed] no role" in formulating hiring criteria, pay, discipline, and other employment terms) *enforced in part*, 715 F.3d 928 (D.C. Cir. 2013).

particular case, the Board—before and after *Airborne*—has considered numerous factors, without requiring the presence of direct-and-immediate control.

Moreover, in rejecting CNN's reliance on *Airborne*, the Board correctly observed (D&O 3 n.7) that there was no explanation for the addition of a direct-and-immediate-control element because *TLI*, which *Airborne* cited for that proposition, makes no mention of that element. In tracing the evolution of joint-employer law, *Browning-Ferris Industries of California, Inc.* ("*BFI II*") agreed that *Airborne* had no basis for adding a direct-and-immediate-control element to the established share-and-codetermine-terms standard.[52] Indeed, CNN now acknowledges (Br. 34-35) that "the Board did not establish the direct-and-immediate-control standard in *TLI*" but maintains that it was applied in *Airborne* "and multiple other decisions." Moreover, contrary to CNN's claim (Br. 19,33) the General Counsel's arguments in its *BFI II* brief to the Board are irrelevant.[53]

### 2.    The Board did not retroactively apply *BFI II*

Throughout their briefs, CNN and the Amici argue (Br. 31-37,ABr. 5-14) that the Board "retroactively and impermissibly applied a new and expanded" standard set forth in *BFI II*, "without acknowledging it was doing so and providing

---

[52] 362 NLRB No. 186, slip op. 10 n.43 (2015), *pet. for review pending* (D.C. Cir. Nos. 16-1028 & 16-1064).

[53] *See generally Midwest Television, Inc.*, 343 NLRB 748, 762 n.21 (2004) (the General Counsel's arguments "do not constitute precedential authority and are not binding on the Board").

adequate reasons for the change."  Essentially, they try to leverage two sentences from a footnote in the decision (D&O 3 n.7) to claim that the Board applied *BFI II* before that decision existed.  They are wrong.  *BFI II* and footnote 7 each correctly identified *Airborne*'s direct-and-immediate-control element as an anomaly or inexplicable departure from the Board's joint-employer law.  But this adds little, if anything, to CNN's position.  Simply put, the Board did not apply a new standard here because, as discussed above, direct-and-immediate control has never been determinative in any post-*Airborne* Board case nor has it been recited or applied by this Court.  Moreover, *BFI II* did not create a new joint-employer standard but merely clarified it, reaffirming the central tenets of the standard that have endured for over three decades.[54]

### 3.    The Board gave proper weight to the joint-employer factors

There is no merit to CNN's (Br. 41-46) and the Amici's (Br. 7-15) assertions that the evidence on which the Board relied was insufficient to support a finding of joint-employer status.  They do not dispute any of the evidence upon which the Board relied.  Instead, they argue that the evidence was insufficient because CNN had no direct-and-immediate control.  As explained, that legal premise is incorrect.  In any event, facts of CNN's direct control of TVS employees' employment terms including hiring, wages, assignment, supervision, and direction, detailed above,

---

[54] 362 NLRB No. 186, slip op. 2 (2015).

would amply satisfy even that standard.

Likewise, CNN's claims regarding the evidence supporting specific joint employment factors are baseless. Referring to its prohibition on TVS's hiring employees from CNN competitors, CNN asserts (Br. 41) that it "excluded one (small) category of potential applicants." In effect, CNN is conceding that, while it did not tell TVS whom to hire, it did tell TVS whom *not* to hire. Imposing a no-competitor requirement eliminates a significant pool of qualified and experienced applicants. CNN's reliance on *Southern California Gas* is misplaced, because that agreement only required the subcontractor to "employ an adequate number of trained personnel" and the Board emphasized that the subcontractor serviced other businesses.[55] Much greater constraints on hiring exist here, and TVS serviced CNN exclusively.

Regarding assignment of TVS's employees, CNN focuses (Br. 42) on the daily rundown but ignores that the Board's finding turns in part on undisputed evidence that many field technicians worked at off-site locations and received all of their assignments from CNN personnel, because no TVS supervisors were there. Likewise, CNN downplays that its unilateral/effective reassignments were so frequent that it prompted many employee complaints and a union grievance—to which TVS's pat response was that, as "the client," CNN could do whatever it

---

[55] 302 NLRB 456, 461-62 (1991).

wanted.

CNN's only argument (Br. 43) regarding its supervision and direction of the employees is that the Board found that "the TVS technicians were highly skilled and did not require detailed instructions on how to perform their jobs."  It ignores the remainder of the Board explanation (D&O 6), citing *Holyoke Visiting Nurses Association*,[56] that "the fact that a subcontractor's employees were professionals and may not have required much instruction as to how to perform their work did not negate the fact that the supervisory instructions and direction that they received came from the putative joint employer."

Lastly, CNN (Br. 43-44) and the Amici (Br. 8) attack the Board's reliance on the ENGAs' cost-plus provisions to find that CNN constrained TVS wages. The Amici argue (Br. 8), erroneously, that the Board "has not previously viewed a cost-plus agreement as evidence of joint employment."  While the Board and courts have cautioned against relying on "operational control" provisions in "cost-plus" subcontracting agreements, joint-employer status may be found where the parties actually applied the subcontracting language to "meaningfully affect the employees' terms and conditions of employment."[57]  Here, as in those cases, CNN

---

[56] 310 NLRB 684, 685 (1993), *enforced*, 11 F.3d 302 (1st Cir. 1993).

[57] *See Dunkin' Donuts*, 363 F.3d at 441 (cost-plus provisions applied to give general contractor "significant' role in determining subcontractor employees' wages, incentive awards, benefits, and other matters); *BFI I*, 691 F.2d at 1124-

exercised effective control that meaningfully affected the technicians'
compensation.  Indeed, as described above, in some instances, it directly restricted
earnings by telling TVS not to assign an employee overtime.

>    **4.    The Board properly rejected CNN's claim that its lack of
>    participation in the Union's prior certification negates joint-
>    employer status**

The Board properly rejected (D&O 8, Reconsid.Ord. 1 n.1) CNN's
contention (Br. 5-6,46-47) that the Union's choice to designate the contractor, not
CNN, as the employer decades ago when it sought a representation election
precludes a joint-employer finding here.  As the Board noted (D&O 8), "the
Union's certification and the history of collective bargaining at CNN's bureaus is
important background information, but of little relevance to the joint-employer
issue."  The Board explained that its task was to determine whether CNN was a
joint employer with TVS, not with any of the former contractors, and that the
appropriate timeframe for that was the period surrounding the unfair labor
practices.[58]

CNN's reliance (Br. 46) on the Union's original certifications as the
representative of the contractor's employees and *Computer Associates*

---

1125 (cost-plus language applied to "co-determine" hiring, hours, pay,
assignments).

[58] *See Goodyear Tire*, 312 NLRB at 676.

*International, Inc. v. NLRB*[59] is misplaced.  There, the Court reversed the Board's

finding that an entity was a joint employer where it had signed a stipulated election

agreement a year earlier identifying another entity as the sole employer.  As the

Board here explained (Reconsid.Ord. 1 n.1), the present case involved

certifications that issued two decades before TVS was even created and the units

have continued intact through four contractors since the original subcontracting.

Moreover, in finding the stipulation binding, the Court in *Computer Associates*

relied on cases in which a party sought to withdraw from a stipulated-election

agreement in the election proceeding itself, or where the stipulation was deemed

binding in a related Section 8(a)(5) case seeking to test the certification.[60]  Those

principles cannot reasonably be extended to this case—an unfair-labor-practice

proceeding many years after, and unrelated to, the representation proceeding in

which the Board certified the Union.

　　To the extent CNN suggests (Br. 6,46) that the Union only considered CNN

a joint employer when TVS was terminated, the record shows otherwise.  For

example, in 1997-98, the Union picketed and handbilled in DC against then-

contractor Potomac Television Services *and* CNN for a fair contract.  The Union

also demanded that CNN participate in bargaining in 1999 and requested

---

[59] 282 F.3d 849 (D.C. Cir. 2002)

[60] *Id.* at 852 (citing, *e.g.*, *Micro Pacific Dev., Inc. v. NLRB*, 178 F.3d 1325, 1335
(D.C. Cir. 1999); *Dynair Servs.*, 314 NLRB 161, 162 (1994).

recognition and bargaining from CNN for NYC and DC in 2002. (D&O 53

n.10,119 n.184;Tr. 297-98,1892-93,4291-92,4310-11, 4315-27,4368,4853-

60,5162-63,6572-75,6982-83,7481-82,7612-13,8285-88, 8443-44,11111,GCX

41,273-275,280-81,284-86,419,420,559,CNNX 4,96.)

## II. SUBSTANTIAL EVIDENCE SUPPORTS THE BOARD'S FINDING THAT CNN VIOLATED SECTION 8(a)(3), (5) AND (1) BY TERMINATING ITS UNIONIZED EMPLOYEES AND FAILING TO BARGAIN OVER THAT DECISION AND ITS EFFECTS

### A. CNN Terminated the ENGAs and TVS Technicians to Avoid Union-Contract Obligations

#### 1. Principles governing union-related discrimination

Section 8(a)(3) of the Act prohibits employer "discrimination in regard to

hire or tenure of employment or any term or condition of employment to ...

discourage membership in any labor organization...."[61]  Accordingly, an employer

violates the Act by terminating its contracting arrangements and discharging or

taking other adverse employment action to avoid recognizing and bargaining with

a union.[62]

"The central question is the employer's motivation for taking the adverse

action, and to make that determination the [Board] employs the … *Wright Line*

---

[61] 29 U.S.C. § 158(a)(3).

[62] *Texas World Serv.*, 928 F.2d at 1434-36.  A Section 8(a)(3) violation derivatively violates Section 8(a)(1), which prohibits employers from interfering with employees Section 7 rights.  *Metro. Edison Co. v. NLRB*, 460 U.S. 693, 698 n.4 (1983).

test."[63]  Under that test, if substantial evidence supports the Board's finding that employees' protected activity was "a motivating factor" of the employer's adverse action, that action is unlawful unless the record compels the conclusion that the employer would have taken the same action even "in the absence of the unlawful motive."[64]

The Board need not accept at face value the employer's explanation, "if there is a reasonable basis for believing it furnished the excuse rather than the reason for [its] retaliatory action."[65]  Indeed, "the policy and protection of the [] Act does not allow the employer to substitute 'good' reasons for 'real' reasons when the purpose of the discharge is to retaliate" for employees' union affiliation.[66]  Once it is established that the so-called legitimate explanations advanced by an employer are pretextual, the inquiry is logically at an end.[67]

### 2.  Facts related to CNN's unlawful termination of the ENGAs

CNN consistently complained about the labor costs of the ENGAs.  (Tr. 3545-47,GCX 184.)  Those concerns compounded in early 2003 when TVS's

---

[63] *Tasty Baking Co. v. NLRB*, 254 F.3d 114, 126 (D.C. Cir. 2001) (citing *Wright Line*, 251 NLRB 1083, 1089 (1980), *enforced*, 662 F.2d 899 (1st Cir. 1981)); *see also NLRB v. Transp. Mgmt. Corp.*, 462 U.S. 393, 401-03(1983) (approving *Wright Line* test).

[64] *Tasty Baking Co.*, 254 F.3d at 126.

[65] *Justak Bros. & Co. v. NLRB*, 664 F.2d 1074, 1077 (7th Cir. 1981).

[66] *Hugh H. Wilson Corp. v. NLRB*, 414 F.2d 1345, 1352 (3d Cir. 1969).

[67] *Transp. Mgmt.*, 462 U.S. at 400-03; *accord Elastic Stop Nut v. NLRB*, 921 F.2d 1275, 1280-81 (D.C. Cir. 1990).

37

payroll began to exceed its monthly budget by approximately $250,000.  TVS projected that ongoing Iraq-war coverage, plus other major events, would increase costs for the foreseeable future.  (D&O 9,119 n.182;Tr. 590-91,15224-32;GCX 185(B)–(J).)

In April 2003, CNN began a series of internal executive meetings to discuss terminating the ENGAs and insourcing the technical work.  (D&O 9,119;Tr. 732-33,736-38,3806-07,13210,14544-47,GCX 101.)  Led by Executive Vice-President of News Operations Cindy Patrick, they discussed implementing a new hiring system, called the Bureau Staffing Project ("BSP"), to replace the TVS technicians.  They discussed "taking advantage of the cancellation of the ENGAs" to assign field technicians as "one-man bands" more frequently than permitted under TVS's collective-bargaining agreements, hiring enough full-time employees to avoid overtime and freelancers, and adding more "requirements to the jobs of cameramen, studio operators and engineers."  (D&O 9;Tr. 3806-07,3811,3814-16,3820,3828,8347,8445.)  One-man bands, overtime, and freelancers (who were paid less than union wages) had been issues of conflict with the Union.  (D&O 58,87 n.103,90,102-104;Tr. 1145,3401,9940-9945,10111,14501,14990, 14999,15337-38,15364,GCX 17 p. 20,40,177,467-69,545,CNNX 645.)

Around that same time, Patrick requested that the DC and NYC bureaus "analyz[e] what a newly designed CNN workforce would cost."  (Tr. 4157-

38

58,12880-81,CNNX 62.)  Projected annual savings were $1.4 million in DC and $1.3 million in NYC.  (Tr. 843,3832,UX 2.)  In July 2003, Patrick informed the executive group that the ENGAs should be terminated based on "the very high-level financial analyses" including a projection of labor-cost savings and based on "where the industry was with respect to technology development."  (Tr. 794-97,800-01,841-43,844-56,14970.)

Meanwhile, a subgroup of CNN managers, led by CNN Director of Newsgathering Matt Speiser, renamed every TVS bargaining-unit position, merged some job functions, and drafted position questionnaires ("PQs") for each new BSP job category.  The PQs were based on PQs used at CNN's Atlanta headquarters. (D&O 9;Tr. 562,1778-80,3814 21,3828, 8347-09,8355-57,9246,12848, 12852,14852-60,GCX 227.)  The PQs for photojournalists listed the same functions performed by the TVS cameramen, but added that 20% of their responsibilities would be editing/producing, and that they must perform nonlinear editing in the field for most events and assignments.  (D&O 9;GCX 227.)  In an email to Patrick that telegraphed CNN's goal of shedding union work, Speiser stated, "In the Photojournalist PQ we should emphasize the use of DV cameras (since this isn't within NABET [Union] jurisdiction now.)"  (D&O 9;GCX 553,Tr. 14859-62.)  Another Speiser email stated, "One very disturbing discovery: as we use new narrowly defined jobs, we're finding that we have less flexibility in the

use of manpower[.]  Where [TVS] now uses people for a variety of jobs within one shift, we think we'll be more tightly constrained by these narrow PQs."  (GCX 552.)  Speiser emphasized that the PQs were too restrictive and asked whether they should be tailored to include equipment not covered under the Union's jurisdiction. (D&O 9;Tr. 14861-62,GCX 552.)

In mid-September 2003, CNN notified TVS that it was terminating the ENGAs at both bureaus.  It expressed appreciation for TVS's performance and service, but added that it wanted a new workforce to take advantage of technological, particularly computer-related, developments in the industry.  (D&O 9;Tr. 464,794,3527-29,15256.)  TVS "had no prior idea that CNN was thinking of ending the ENGAs."  (Tr. 3556.)

On September 29, CNN repeatedly lauded TVS and its employees in announcements of their termination.  Its press release praised TVS as doing "an excellent job running its business and meeting the needs of CNN."  (D&O 9-10, 58;Tr. 803-04,8049,8210,8251-53,8346,8529,12884,GCX101,404.)  Patrick emailed CNN's employees at both bureaus stating, "I want to be very clear when I say that we have the highest regard for TVS and its staff…."  (D&O 9-10;Tr. 8210,12884,GCX 338.)  CNN's DC and NYC bureau chiefs emailed their respective staffs reiterating that TVS "has done an excellent job meeting the needs

of CNN," and adding that TVS's management and employees "are professionals

through and through."  (D&O 10;GCX 281,404,515.)

Also on September 29, at an employee meeting to announce TVS's

termination, NYC Bureau Chief Karen Curry stated that CNN had to "get rid of"

TVS because it came with union "rules and regulations...."  (D&O 10,19 &

n.37,22-23,58;Tr. 10866,10875-76,GCX 515.)  That same day, CNN White House

Executive Producer Danielle Whelton told a TVS cameraman that there would be

"no union" when CNN took over because there would "be no role for the Union."

(D&O 19 n.37,23,59;Tr. 3775-77,13749-51,13767-70.)  Then, on October 3,

CNN's DC Bureau Chief Kathryn Kross told Local 31 President Mark Peach that

"the Union would not be a part of CNN after December 5 [the ENGA termination

date]."  (D&O 10,60;Tr. 1210-24,1350-51,1371,1377,1383,1395,GCX 107,108.)

### 3.    Substantial evidence supports the Board's finding that CNN terminated the ENGAs to avoid union obligations

In finding that CCN's termination of the ENGAs was unlawfully motivated,

the Board pointed to "substantial" evidence of union animus.  Specifically, the

Board relied (D&O 18) on the repeated complaints by CNN officials about the

costs imposed by the union contracts, the pretextual reasons given for the ENGAs'

terminations (below pp. 43-44), the discriminatory application of the BSP in hiring

the new workforce (below pp. 53-58), and repeated statements that CNN's post-

TVS operations would be "nonunion."

This evidence amply supports the Board's finding (D&O 17-19,62,69,79,89,101,) that CNN's cancellation of the ENGAs and discharge of TVS's employees was part of an unlawfully motivated plan to avoid the Union and the obligations under the collective-bargaining agreement, particularly its labor costs.  As shown above (pp. 37-39), labor-cost reduction was the centerpiece of Patrick's proposal to terminate the ENGAs.[68]  Likewise, Bureau Chief Curry emphasized that CNN had to "get rid of" TVS because of the Union's "rules and regulations."

The record further supports the Board's finding (D&O 8, 17) that "unbeknownst to TVS or the Union," CNN planned the termination of the ENGAs and changed every bargaining-unit job and PQ to escape the Union's jurisdiction. An employer's "secretly" planned elimination of bargaining-unit jobs interferes with employees' Section 7 rights.[69]  Further, as discussed below (pp. 39-40), the change in PQs diminished the significance of unit employees' experience when they applied for the "new" jobs.

Ultimately, CNN's actions implemented DC Bureau Chief Kross's blunt statement that "the Union would not be a part of CNN[,]" and Executive Producer Whelton's unlawful statement that, after the contract terminations, there would "be

---

[68]  *See e.g.*, *GFS Bldg. Maint.*, 330 NLRB 747, 752 (2000) ("Comments about keeping labor costs down are fundamentally statements of antiunion animus").
[69] *NLRB v. Centra, Inc.*, 954 F.2d 366, 372, 374 (6th Cir. 1992) ("secretly" deciding to terminate subcontract and implement hiring plan)

no role for the Union" at CNN.

### 4.     CNN's defense is pretextual

CNN's defense (Br. 51)—that technological changes prompted the ENGAs' termination—flatly contradicts the credited evidence, not challenged by CNN. Accordingly, substantial evidence supports the Board's finding (D&O 18-19, 51) that CNN's technology defense is pretextual and, therefore, CNN failed to establish that it would have taken the same action even absent an unlawful motive.

As the Board found (D&O 18-19), the TVS technicians were fully equipped to adapt to technological developments.  Indeed, the TVS technicians had "lived through substantial technological changes, most notably going from videotape to digital media, and then from digital to HD, with ever increasing reliance throughout on sophisticated computer programs."  There is no evidence that CNN ever terminated or directed the termination of any TVS unit employee for failing to keep up with those changes or inability to perform the work.  (D&O 19.) Moreover, when it terminated the ENGAs, after secretly deciding to do so, "CNN personnel went out of their way to praise the abilities of the two bargaining unit workforces."  (D&O 19.)[70]

CNN simply discounts (Br. 51-52) past technological changes handled by TVS employees and does not explain why it summarily excluded TVS employees

---

[70] *Lucky Cab Co*., 360 NLRB No. 43, slip op. at 4-5 (2014) (evidence of pretext may be used to show discriminatory motivation).

from changes to its broadcasting process. Absent an alternate explanation, CNN's focus on union constraints and avoiding those constraints in the future demonstrates its unlawful motivation. Further, even if CNN genuinely sought technological advancement, as this Court has held, "[t]he question, however, 'is not just whether the employer's action also served some legitimate business purpose, but whether the legitimate business motive would have moved the employer to take the challenged action absent the protected conduct.'"[71] CNN failed to show that, absent their union affiliation, it would have terminated the highly praised TVS employees to accomplish its goal.

### B. CNN Violated Section 8(a)(5) and (1) by Refusing to Bargain Over the Decision to Terminate the TVS ENGAs and Employees and the Effects of that Decision

Section 8(a)(5) of the Act makes it unlawful for an employer "to refuse to bargain collectively with the representatives of his employees" over mandatory terms and conditions of employment.[72] That obligation is "no less" for a joint employer.[73] Thus, a joint employer violates its bargaining obligation by terminating a subcontract and changing employment terms without providing the

---

[71] *Bruce Packing Co. v. NLRB*, 795 F.3d 18, 23 (D.C. Cir. 2015) (citation omitted).

[72] 29 U.S.C. § 158(a)(5); *see Exxon Chem. Co. v. NLRB*, 386 F.3d 1160, 1164 (D.C. Cir. 2004) (violation of Section 8(a)(5) derivatively violates Section 8(a)(1)).

[73] *American Air Filter Co.*, 258 NLRB 49, 53 (1981); *see also*, *G. Heileman Brewing Co. v. NLRB*, 879 F.2d 1526, 1530 (7th Cir. 1989).

union notice and an opportunity to bargain.[74]  Moreover, "the employer must []

bargain with the union over the *effects* of [such a] decision on [unit] employees.[75]

It is undisputed that CNN terminated the ENGAs and TVS employees

without notice to or bargaining with the Union:  CNN terminated the ENGAs, and

then CNN and TVS simply told the Union that unit employees would no longer

work in DC and NYC, but could apply for CNN jobs.  CNN then rebuffed multiple

requests for bargaining.  (D&O 10,60;Tr. 264-68, 1210-24,13265-65,1370-

71,1395,10609,GCX 22-28,107,108.)

Given that undisputed evidence, the record fully supports the Board's

finding (D&O 17, 55) that CNN violated the Act by failing to bargain over the

termination decision and its effects.  Indeed, rather than providing the Union notice

and an opportunity to bargain, CNN presented its decision to cancel the ENGAs

and terminate all bargaining unit employees to the Union as a *fait accompli*.[76]  As

it is undisputed that terminating the ENGAs and unit employees was a mandatory

subject, presenting that *fait accompli* violated Section 8(a)(5) and (1).[77]

---

[74] *See, e.g.*, *Centra*, 954 F.2d at 370, 372-73; *see generally, NLRB v. Katz*, 369 U.S. 736, 747-48 (1962).

[75] *Dodge of Naperville, Inc. v. NLRB*, 796 F.3d 31, 36 (D.C. Cir. 2015), *cert. denied*, ___ U.S. ___, 2016 WL 153809 (2016) (emphasis original).

[76] *Regal Cinemas, Inc. v. NLRB*, 317 F.3d 300, 314 (D.C. Cir. 2003); *D & S Leasing*, 299 NLRB at 660 n.10.

[77] *D & S Leasing*, 299 NLRB at 660 (failure to bargain over decision and effects of terminating subcontract).

Abandoning the defenses it raised to the Board, CNN now argues (Br. 39)

that, because it was not a joint employer, it lacked any bargaining obligation.  As

demonstrated above, CNN was a joint employer and therefore was required to

bargain with the Union.

III.  **SUBSTANTIAL EVIDENCE SUPPORTS THE BOARD'S FINDINGS THAT CNN VIOLATED SECTION 8(a)(3) AND (1) BY DISCRIMINATORILY FAILING TO HIRE TERMINATED TVS EMPLOYEES TO AVOID SUCCESSORSHIP OBLIGATIONS, SECTION 8(a)(1) BY MAKING COERCIVE STATEMENTS, AND SECTION 8(a)(5) AND (1) BY REFUSING TO RECOGNIZE AND BARGAIN WITH THE UNION AND UNILATERALLY SETTING EMPLOYMENT TERMS**

A.  **Successor Employers' Statutory Obligations**

An employer that buys or otherwise takes control of the unionized business

of another employer succeeds to the collective-bargaining obligation of the

predecessor employer, if the new employer is a "successor."  Under *NLRB v. Burns*

*Security Services*, the new employer is a successor if the business is continued

without substantial change and its predecessor's employees comprise a majority of

its workforce.[78]

Under Section 8(a)(3) and (1), an employer may not lawfully avoid its

bargaining obligation by pursuing a hiring policy that is designed to keep its

---

[78] 406 U.S. 272, 294-95 (1972); *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 36-41 (1987).

predecessor's employees in the minority.[79]  To establish such a violation, it is not

necessary to show that the new employer did not hire any of the predecessor's

employees, or that those not hired were singled out because of their union support.

It is sufficient that, if the discriminatees had been hired, the total number of the

predecessor's employees hired would have been enough to trigger a bargaining

obligation, and that the failure to hire was designed to avoid that result.[80]  As in all

discrimination cases under the Act, the *Wright Line* analysis of motivation,

described above (pp. 36-37), applies.[81]

In addition, as explained above, an employer violates Section 8(a)(5) and (1)

by refusing to recognize and bargain with its employees' representative.  Where an

employer has pursued a discriminatory hiring policy to avoid its successorship

bargaining obligations, it is axiomatic that the employer "cannot escape its

bargaining obligation on the ground that the union does not represent a majority of

its employees."[82]  In such a situation, majority status will be presumed and

successorship established, assuming the requirement of substantial continuity of

---

[79] *See Howard Johnson Co. v. Hotel Employees*, 417 U.S. 249, 262 & n.8 (1974); *accord Elastic Stop Nut*, 921 F.2d at 1279-81; *New Breed Leasing Corp. v. NLRB*, 111 F.3d 1460, 1466 (9th Cir. 1997).

[80] *See Great Lakes Chem. Corp. v. NLRB*, 967 F.2d 624, 628 (D.C. Cir. 1992).

[81] *Laro Maint. Corp.,* 56 F.3d at 228-29; *Elastic Stop Nut*, 921 F.2d at 1280.

[82] *Capital Cleaning Contractors, Inc. v. NLRB*, 147 F.3d 999, 1004 (D.C. Cir. 1998).

operations is shown.[83]  The presumption of majority status promotes the Act's

"overriding policy" of "industrial peace" by permitting unions to "develop stable

bargaining relationships with employers" and to "pursue the goals of their

members."[84]  Accordingly, while a successor employer is usually free to set initial

terms and conditions of employment without bargaining, an employer that

discriminates in hiring to avoid successorship does not have that right and violates

Section 8(a)(5) and (1) of the Act by unilaterally altering any preexisting

employment terms.[85]

### B.   CNN Plans and Implements Its BSP Recruitment In a Manner that Discriminated Against Terminated TVS Employees

Substantial evidence supports the Board's finding (D&O 17,19-21,50,57-

58,62-64) that CNN's decision to embark on the BSP and its failure to hire over

100 TVS technicians was unlawfully motivated.  Indeed, it was part of an overall

union-avoidance strategy.  In addition to the animus from CNN's wholesale

termination of TVS employees described above (pp. 41-44) (D&O 18-19,64), the

Board relied on evidence that CNN manipulated job descriptions, disregarded TVS

employees' experience, made coercive statements that bluntly showed its anti-

---

[83] *See Fall River*, 482 U.S. at 37-38 (1987); *accord NLRB v. Staten-Island Hotel Ltd. Partnership*, 101 F.3d 858, 862 (2d Cir. 1996); *U.S. Marine Corp. v. NLRB,* 944 F.2d 1305, 1321-22 (7th Cir. 1991) (en banc).

[84] *Fall River*, 482 U.S. at 38-39; *accord NLRB v. Creative Food Design Ltd.*, 852 F.2d 1295, 1300 (D.C. Cir. 1988) (en banc).

[85] *Elastic Stop Nut*, 921 F.2d at 1282; *see U.S. Marine Corp.*, 944 F.2d at 1323.

union motivation, and engaged in disparate hiring practices.

### 1.    Manipulation of job descriptions

The Board found (D&O 19) that the "principal evidence" of CNN's unlawful discrimination lay in its staffing, including CNN's deliberate changing of every bargaining-unit job and PQ.  In the case of the new photojournalist category, Speiser, who led CNN's committee to change the PQs, explicitly admitted the intent to remove those jobs from the Union's jurisdiction via PQ revision: "In the Photojournalist PQ we should emphasize the use of DV cameras (since this isn't within NABET jurisdiction now.)"  (D&O 19,73;GCX 553.)  Similarly, DC Engineering Director Tu Vu admitted that the changes were a sham, as the positions "had the same job responsibilities [as TVS engineers], and the only thing that had changed was adding BIT to the title" because "all the positions simply got a title change."  (Tr. 1965-68,2422;GCX 134(A).)  Additionally, CNN's photojournalist job posting diverged from the PQs and misled TVS applicants about the significance of certain skills, which they could have obtained to improve their chances of hire.  And CNN later admitted that those skills were actually "marginal" to the job.  (D&O 73-74;Tr. 4867-68,5695-96,8353.)

The Board also reasonably found (D&O 19) that CNN intended its job and PQ changes to minimize the significance of bargaining-unit employees' prior experience when they applied for the "new" BSP jobs.  Indeed, in an October 3

meeting to discuss the bargaining-unit employees' status going forward, CNN's DC bureau chief explicitly informed the Union that CNN would give no weight either to former-TVS employees' tenure or commendations received while working at CNN in its BSP hiring decisions.  (D&O 10,60;Tr. 1210-24,1350-51,1371,1377,1383,1395.)

CNN wrongly claims (Br. 56) that it did not intend to remove jobs from union jurisdiction, relying on the Board's finding that the changes were based on PQs that CNN had already implemented in Atlanta.  But CNN ignores the Board's additional finding (D&O 64) that, in Atlanta and other bureaus, the PQ and job changes happened without the wholesale replacement of those incumbent workforces unlike CNN's termination of the entire TVS workforce.  That evidence, and the fact that DC and NYC were CNN's only unionized bureaus (Tr. 148), supports the Board's finding that the job and PQ changes were directly motivated by union animus.

CNN speculates (Br. 56 n.7) that Speiser's email "could" have referred to the need to inform TVS applicants of the "required skill set."  Contrary to the Board's appropriately literal reading, CNN's strained interpretation hardly demonstrates a desire to assist the TVS employees, considering that the evidence, described above, shows disconnects among the job postings, PQs, and actual job requirements.

50

### 2.    CNN's antiunion statements violated Section 8(a)(1) and showed animus

The record also amply supports the Boards findings (D&O 19,22-23,58-62) that four CNN "no union" statements were direct evidence of unlawful motive and independently violated Section 8(a)(1) of the Act. [86]  An employer's statement violates Section 8(a)(1) if it has a reasonable tendency to interfere with, restrain or coerce employees in the exercise of the rights guaranteed by Section 7 of the Act. 29 U.S.C. § 158(a)(1).

As already shown (pp. 40-41), on September 29 Bureau Chief Curry stated that CNN had to "get rid of" TVS because it came with union "rules and regulations," and Executive Producer Whelton stated that there would be "no role for the Union" when CNN took over.  On top of that, on about November 25, NYC Operations Manager Lou Strauss confirmed to a TVS employee during his job interview that it was a "safe assumption" that the "Union won't be back at CNN." (D&O 23;Tr. 10984.)  And in a series of conversations, both before and after the BSP implementation, NYC Photojournalist Manager Jeff Kinney told a cameraman that he would not get freelance work because of his "prior relationship with TVS and the Union."  (D&O 23;Tr. 9840-44,9872,9875.)

As this Court has made clear, when an employer tells applicants that it will be nonunion before it hires its employees, it violates Section 8(a)(1) because it

---

[86] *Williams Enters., Inc. v. NRLB*, 956 F.2d 1226, 1234 (D.C. Cir. 1992).

"indicates to the applicants that [the employer] intends to discriminate against the [predecessor's] employees to ensure its nonunion status."[87]  That is because "prior to its hiring decisions, a new employer does not know whether it will have a duty to recognize and bargain with the predecessor's union because it does not know whether it will hire a majority of the predecessor's employees."[88]

CNN attempts (Br. 52-53) to downplay its statements by claiming that they were "extemporaneous," came after it had already failed to hire employees, and were efforts to somehow boost the morale of the fired TVS employees.  Such claims fail to negate that they had a "reasonable tendency to coerce in the totality of the circumstances" which, CNN acknowledges (Br. 52) is the standard for finding a Section 8(a)(1) violation.[89]

Its claim (Br. 53-54) that Curry's statement was lawful because it was made to only CNN employees also fails.  Both represented (TVS) and unrepresented (CNN) employees enjoy rights under Section 7 of the Act to engage in union activity.  Curry's statement that CNN had to "get rid of" TVS because of union rules infringed on those rights.  CNN also speciously contends (Br. 53-54) the Board ignored that a witness did not recall Curry "to be referring to *union* rules (as opposed to rules imposed by TVS)."  The Board, however, specifically noted

---

[87] *Id.* (internal quotations and citation omitted).

[88] *Id.*

[89] *McClatchy Newspapers, Inc. v. NLRB*, 131 F.3d 1026, 1036 (D.C. Cir. 1997).

(D&O 58) that witness Morrisey admitted uncertainty about Curry's exact

wording, but concluded that Curry necessarily meant rules in the collective-

bargaining agreement because there were no other possible rules, in context.  The

Board thoroughly explained (D&O 23, 58-59) its credibility determination and

CNN failed to show that it is "patently unsupportable," as it must do to overcome

such a determination.[90]  Moreover, Curry's no-union statement, made while

advising those very CNN employees to apply for BSP jobs, "blatantly coerces

employees…and constitutes a facially unlawful condition of employment."[91]

(D&O 22.)  Given the extensive evidence of animus, CNN misplaces its reliance

(Br. 54) on *TIC-The Industrial Co. v. NLRB*, where the Court held that "a single"

non-union comment was insufficient to prove animus.[92]

### 3. Inconsistent and discriminatory application of "behavioral interviewing" guidelines in the BSP's hiring decisions

Overwhelming evidence supports the Board's finding (D&O 19-21,62-101)

that CNN discriminatorily applied the ostensibly objective guidelines of

"behavioral interviewing" in BSP hiring.  Designated recruiters for each BSP job

category screened applications for completeness and the requisite qualifications

---

[90]  *Inova Health Sys.*, 795 F.3d at 80.

[91] *Advanced Stretchforming Int'l, Inc.*, 323 NLRB 529, 530-31 (1997), *enforced*, 208 F.3d 801 (9th Cir.), *amended and superseded on reh'g,* 233 F.3d 1176 (9th Cir. 2000).

[92] 126 F.3d 334, 338 (D.C. Cir. 1997).

before scheduling "face-to-face" interviews with designated hiring managers. Those managers, working in groups of at least two, were to interview only recruiter-referred applicants using a comprehensive 10-page guide to rate them on various criteria. (D&O 11;Tr. 3942-44,5586,9292, 9364-65,GCX 228,519.) HR coordinators were to summarize managers' interview scores for each applicant. (D&O 11;GCX 135.) Using the summaries and their interviewing notes, the hiring managers were to conduct debriefing/selection sessions to discuss the strengths and weaknesses of each applicant, document their discussions, and select the most qualified candidates. (D&O 11;Tr. 5784,5797-800,7899-901,9130-39,10218-26,GCX 450,499,500.) Finally, recruiters and HR personnel were to run background checks on the selected candidates before offering them jobs. (D&O 11;Tr. 14502,14511.)

When CNN kicked-off its BSP recruitment drive on September 29, it instructed CNN and TVS employees that all applicants had to undergo the entire behavioral interviewing/hiring process. (D&O 11;Tr 1904-05,8524-27,10879,13106-11,14886-87,CNNX 503,504.) Using an elaborate spreadsheet, CNN tracked every job applicant's progress, but separately tracked bargaining-unit employees, listing their TVS job status, union membership, and pay grade. (D&O 11;Tr 3882-87,2493-2502,2603-06,GCX 157-159,CNNX 30.)

Despite this seemingly carefully-structured system for hiring, the Board

54

found (D&O 19) that there were widespread screening/interviewing/debriefing/ hiring disparities that adversely affected only TVS applicants.  In every job category, when it came to the non-TVS applicants, hiring managers ignored the protocols intended to ensure objectivity.  They interviewed multiple non-TVS candidates who were previously rejected by recruiters because they were unqualified, their applications were incomplete, or they applied after the closing dates, or never applied.  (D&O 72;Tr. 5873,GCX 330.)  They "passed along" the names of supervisees or acquaintances to other hiring managers, "vouched" for them, officiated as their (often sole) interviewer and sometimes did phone interviews.  They wrote interview notes for non-TVS candidates whom they never interviewed, and commented on demo reels and videos that were never submitted. (D&O 12,19-20,64-76,91-106;Tr. 2089,2098, 2212-14,3900-03,4030-31,2502,5767-69,5871-73,13148-49; GCX 329,330,CNNX 515, 516.)  Although it announced that anyone who wanted a BSP job had to go through the behavorial interviewing process, CNN hired entire categories of its own employees without subjecting them to that process.  (D&O 19 n.38, 65-68 & n.55;Tr. 10412-13,12254-55,GCX 396,397,CNNX 531.)

Conversely, every TVS applicant had to undergo the entire hiring process, and was subjected to at least two sets of face-to-face interviews by teams of two or more hiring managers.  (D&O11-15,64-81;Tr 3887-88.)  Virtually no hiring

manager had worked with TVS applicants, nor did they consult with CNN producers, editors, and reporters who had. And they ignored any favorable, albeit unsolicited, recommendation received for TVS applicants. (D&O 19-20;Tr. 2111-12,7579-81,15382-83,GCX 387,389). DC Director of Engineering Vu, who had worked intimately with TVS engineers, and was the only DC manager on the BIT/engineering hiring committee, acknowledged that he did not, at any time during the BSP, "try to steer the discussion by touting the strengths of TVS employees whose working history [he] knew." (D&O 20;Tr. 2321,2324.)

As the Board found (D&O 14-15,20,62,64,74-76), CNN also altered the scores on HR summaries to lower the rankings of TVS applicants and raise the rankings of non-TVS applicants, particularly so-called "growth candidates," who lacked the requisite minimum number of years, qualifications, or skills, but were designated by CNN as having "growth" potential. CNN instructed the BSP administrative coordinator to prioritize the non-TVS selectees' reference checks, and to ignore negative "professional references" she received for them and instead to seek "personal references." No TVS candidate received a negative reference. (D&O 20,65;Tr. 14495-99,14504.)

As a result of this skewed process, CNN failed to hire many well-qualified TVS technicians. Indeed, CNN did not hire 4 of the 7 most skilled and versatile DC engineers. For example, CNN did not hire Dennis Norman, who was

56

commonly known as the "encyclopedia of knowledge when it came to the work at CNN," and the "go-to guy" for equipment problems.  (Tr. 2636, 2641.)  All 4 of those engineers worked on critical tasks of installing and upgrading the digital systems and equipment, set-up for live news events and pool coverage, and complex field assignments often as one-man crews or the engineer-in-charge. (D&O 13;Tr. 1745-49,1755-57,1798-800,2636-40,2643-49,2663-65,2791,3003-08,3187-89,14246.)  Notably, CNN also failed to hire many of the most active union supporters in DC despite praise for their skills.  (D&O 15;Tr 1153-56,6568-77,6744-77.)  Overall, the record shows that CNN rejected many of the most capable and experienced TVS candidates after disadvantaging them in the hiring process, even to the point of downgrading their ratings while simultaneously taking hiring shortcuts with non-TVS applicants and ignoring their negative references. Also, by giving preference to unqualified "growth" candidates, CNN inherently injected subjectivity into a hiring process that it touted as objective.  Moreover, separate monitoring of unit employees' hiring supports the inference that CNN sought to ensure that it did not hire too many union employees.[93]

    While not contesting the disparities in the debriefing/selection, summaries, reference checks, and job-offer process, CNN maintains (Br. 59) that the "neutrality of CNN's hiring policy is not undermined" by those disparities.  CNN,

---

[93] *See Great Lakes Chem.*, 967 F.2d at 628.

however, finds (Br. 59) no support in *Ken Maddox Heating & Air Conditioning, Inc.*,[94] and *Tambe Electric, Inc.*,[95] because the hiring decisions there were based on "neutral hiring policies, uniformly applied" to all applicants.[96]

### 4.    CNN's explanation of its BSP is pretext

The record also amply supports the Board's finding (D&O 18-19,21,62-64,87,97) that CNN's technology-based explanation for the BSP was pretext and, therefore, that CNN failed to show that it would not have hired the TVS employees absent their union affiliation.  CNN does not dispute the Board's finding (D&O 18-19) that unit employees, most of whom had handled substantial technological changes since the inception of CNN's broadcasting operations at the DC and NYC bureaus, had consistently and effectively used CNN's "cutting edge" technology. (Tr. 580,808-09, 887,1182-82,1606-07, 2129-33,2259,3554-56,7718-20,8224-25,8536-38,8543-41, 8602-03,8974,12338,GCX 40.)  As provided in the ENGAs, CNN had always approved and paid for TVS employees to receive appropriate technology training.  Indeed, when CNN announced the ENGAs' termination, TVS was conducting training for nonlinear editing, one of the very "technological development" aspects that CNN allegedly sought in its BSP "dream team" workforce.  (Tr. 1258-59.)  The record also amply shows that TVS employees

---

[94] 340 NLRB 43 (2003).
[95] 346 NLRB 380, 382 (2006).
[96] *Ken Maddox*, 340 NLRB at 44.

quickly mastered CNN-provided broadcast equipment and gear. (Tr. 1181,1590,1603-05,1690-01,1608-10,4901-03,4972,4984-89,5008-09, 5013,5016,5023-24,6007,7007,15218,16314, GCX 180 p.4.) In light of that undisputed evidence, plus CNN's repeated praise for the "excellent" abilities of TVS workforces, the Board reasonably determined (D&O 10,19,62) that CNN's claim that it needed new employees to handle technological changes, rather than hiring its tried-and-true TVS technicians, was pretextually false.[97]

Moreover, CNN did not acquire staff more skilled than the TVS workforces through the BSP. It is undisputed that, from the first day of the BSP, CNN conducted extensive technological training for the entire new workforce. (D&O 15,62-64;GCX 323,145,146,213,513). CNN trained every photojournalist in nonlinear editing, final cut pro, and file transfer protocol. Those were the new technological features that CNN claimed were essential to its BSP hiring decisions. (D&O 63;Tr. 6394,15501,15626.) Importantly, while the former TVS employees hired by CNN seamlessly adapted to the new skills, some of the non-TVS employees did not, despite receiving more training than their former TVS counterparts. (D&O 63;Tr. 8196-97,15482-83,15633-34,GCX 543,545.) For example, several non-TVS hires asked former-TVS technician Richard Morse how

---

[97] See *O.G.S. Tech.*, 356 NLRB 642, 646-47 (rejecting employer defense that subcontracting decision was based on desire to take advantage of new die-cutting technology).

to operate their equipment. (Tr. 6268,6272.) CNN also asked Morse to step in when an inexperienced non-TVS photojournalist incorrectly cut away during the live broadcast of Colin Powell's last briefing as Secretary of State. The CNN reporter covering the briefing complained, and CNN received several complaints from the TV networks in the pool about that mistake. (Tr. 6276.)

For at least the first 8 months of the BSP, many of the photojournalists were not required to use the technological skills they acquired in the training. And only after that time did CNN provide them with the laptops on which they had trained to use in the field. (D&O 15,63;Tr. 5528.) The ongoing BSP training requirements, juxtaposed with the lack of urgency to provide equipment or require application of the training, prompted the DC bureau chief's concession that he did not know why it was necessary to cancel the ENGAs to address technology issues. (D&O 63;Tr. 5528.)

### 5.    CNN's claims regarding its hiring lack merit

CNN's claims (Br. 48-49) that its hiring decisions were not unlawfully motivated lack merit. First, CNN claims (Br. 13-14,18,21,23-24,27,60) that the Board "ignored statistical evidence" presented by CNN's witness, Dr. Mary Baker, to show that TVS applicants were four times more likely to be hired than the average applicant. But the Board explicitly discredited Baker's testimony that CNN's hiring process was nondiscriminatory, finding that she discounted critical

60

factors. (D&O 121 & n.190) First, CNN managers selected numerous non-TVS applicants for interviews after a debriefing process that, as described above, departed from established procedures in ways that disadvantaged TVS applications. Baker also discounted the possibility that the TVS applicants, who had successfully done the jobs for years, were better qualified than non-TVS applicants (who, as shown, often lacked the basic qualifications). The Board also found (D&O 121 n.190) that Baker's analysis ignored that almost 100% of the CNN incumbents who participated in the BSP were hired or kept their jobs in contrast to the 100+ TVS employees who did not.

CNN's further point (Br. 49) that it hired union supporters is unavailing. As the Board noted (D&O 62), the overwhelming evidence that CNN discriminated against many unit members outweighs the fact that that it hired other unit members, including some union activists.[98] Further, discriminatory motive is not disproved by an employer's evidence that it did not take similar actions against *all* union adherents.[99] Moreover, as the Board also found (D&O 62), the record shows that had CNN completely refused to hire TVS employees it would not have been able to operate its business. (GCX 595.)

---

[98] *Master Sec. Servs.*, 270 NLRB 543, 552 (1984); *Volair Contractors, Inc.*, 341 NLRB 673, 676 n.17 (2004).

[99] *NLRB v. W.C. Nabors*, 196 F.2d 272, 276 (5th Cir. 1952) ("The fact that respondent retained some union employees does not exculpate him from the charge of discrimination as to those discharged.") (citing *NLRB v. Link-Belt Co.*, 311 U.S. 584, 602 (1955)).

Equally baseless is CNN's contention (Br. 48,57) that, even assuming animus, its "use of a neutral hiring policy shows that it would have made the same hiring decisions."  CNN ignores that it was the *application* of its hiring process that was unlawful (not the hiring policy *per se*) and that, as shown above, ample credited evidence supports the Board's finding (D&O 19-20) that CNN manipulated and disregarded the neutral hiring protocols it now touts to TVS applicants' disadvantage.[100]  Indeed, CNN concedes (Br. 55 n.55) many of the disparities in its application of the hiring policy.  Thus, contrary to its claims (Br. 55 n.6), the totality of its disproportionate application of the hiring policy evinced unlawful discrimination.

Lastly, citing non-successorship cases, CNN contends (Br. 57-60) that the Board disregarded its own precedent in applying *Wright Line* in a refusal-to-hire case.  This argument misses the boat legally and factually.  First, many of CNN's cited cases use the refusal-to-hire analysis in *FES (Div. of Thermo Power)*, which is inapplicable to successorship hiring.[101]  Almost 10 years ago, the Board, in *Planned Building Services, Inc.*, determined that *Wright Line*, not *FES*, applies to

---

[100] *See Waterbury Hotel Mgmt.*, *LLC v. NLRB*, 314 F.3d 645, 654 (D.C. Cir. 2003) ("Where a new employer strictly enforces its asserted criteria against the predecessor's employees, but not against other applicants, it has not met its [*Wright Line*] burden, and the General Counsel has met his."); *accord Southwest Merch. Corp. v. NLRB*, 53 F.3d 1334, 1343 (D.C. Cir. 1995) (unlawful motivation found where employer implemented hiring process that discriminated against union workers).

[101] 331 NLRB 9 (2000), *enforced*, 301 F.3d 83 (3d Cir. 2002).

refusal-to-hire claims in the successorship context.[102]  This Court has approved the Board's distinction between standards applicable to the two different hiring scenarios[103] and application of *Wright Line* to successorship hiring.[104]  CNN does not even acknowledge that analytical difference.

In any event, CNN misplaces its heavy reliance (Br. 59-60) on *Zurn/N.E.P.C.O.*, where the Board found an employer's facially neutral hiring criteria favoring former employees and employee-recommended applicants were lawful, even though applicants hired under those criteria "would tend not to be union supporters."[105]  The employer established a legitimate interest in hiring a "known quantity" and "a qualified, dependable work force," which was critical to the Board's finding of no discriminatory motive.[106]  Here, the Board reasonably rejected CNN's hiring policy as a defense because the deviations from that policy were so substantial.  The Board found (D&O 11-15,18-21,57-122) that CNN's systematic manipulation of that policy, along with other evidence that CNN attempted to frustrate applications from union applicants, precluded CNN from relying on its policy as a defense.  Indeed, CNN did the opposite of the employer

---

[102] 347 NLRB 670, 672-73 (2006), *overruled on other grounds*, *Pressman Cleaners*, 361 NLRB No. 133 (2014).

[103] *W & M Prop. of Conn., Inc. v. NLRB*, 514 F.3d 1341, 1346-48 (D.C. Cir. 2008).

[104] *Waterbury Hotel Mgmt., LLC*, 314 F.3d at 651; *Laro Maint. Corp.*, 56 F.3d at 228-29; *Elastic Stop Nut*, 921 F.2d at 1280-81.

[105] 345 NLRB 12, 15, 19 (2005), *pet. for review denied sub nom. N. Michigan Bldg. & Const. Trades Council v. NLRB*, 243 F. App'x 898 (6th Cir. 2007).

[106] *Id*. at 15.

in *Zurn*; as the Board found, CNN counterintuitively rejected familiar and highly praised TVS employees even though "it is human nature to hire 'known quantities.'" (D&O 71.)[107] Despite TVS applicants' experience and success in working at CNN, that admittedly "wasn't a factor at all" in CNN's hiring. (D&O 72;Tr 3762,5515,5693.)

## C.    The Board Reasonably Found that CNN Was a Successor Employer and Therefore Violated Section 8(a)(5) and (1) of the Act by Refusing to Recognize and Bargain with the Union and by Unilaterally Changing Extant Employment Terms

### 1.    CNN was a successor under *Burns*

The Board found (D&O 21,51,57) that CNN was a successor to TVS and was therefore obligated to bargain with the Union. It further found that, because of its discriminatory hiring practices, CNN was not entitled unilaterally to set the initial employment terms for its employees.

As an initial matter, CNN does not dispute the Board's finding (D&O 15,51,57,109) that, after termination of the ENGAs, it continued the same business operations with employees performing the same work, at the same location, and using the same equipment as its predecessor. CNN also cannot dispute that, in the historical bargaining units, the majority of the employees it hired consisted of former TVS unit employees: 48 of 86 employees hired in DC (55%) and 65 of 120 employees by CNN in NYC (54%) were former TVS employees. (D&O 83.) In

---

[107] *Smoke House Rest.*, 347 NLRB 192, 196 n.13 (2006).

those circumstances, both of the *Burns* elements of successorship status—

continuity of the business enterprise and of the workforce—are satisfied.[108]

Therefore, as a successor, CNN was obligated to recognize and bargain with the

Union.  It is undisputed, however, that CNN never recognized the Union and that it

unilaterally established wages, hours, and terms and conditions of employment for

bargaining-unit employees different from those previously in effect.  It therefore

violated Section 8(a)(5) and (1).[109]

     CNN's primary defense to the Board's successorship finding is that the

Board "failed to engage in the necessary analysis" (Br. 62) and, thus, improperly

maintained the historical bargaining units rather than finding appropriate the larger

units CNN claims appropriate.  Specifically, CNN contends (Br. 28,61-64) that

"[o]nce the [BSP] was completed [] the only appropriate bargaining units were

'wall-to-wall' units of each bureau's entire production staff."  And because the

TVS employees would not have made up a majority of the employees in those

wall-to-wall units, CNN would not have been a successor to TVS and would not

have had to recognize the Union.  However, as this Court has recognized with

approval, "[u]nder existing Board precedent, there is a strong presumption favoring

---

[108] 406 U.S. at 294-95.

[109] *See Fall River*, 482 U.S. at 47-52; *accord Elastic Stop Nut*, 921 F.2d at 1279-81.

the maintenance of historically recognized bargaining units."[110]  Thus, the Board

"is reluctant to disturb units established by collective bargaining so long as those

units are not repugnant to Board policy or so constituted as to hamper employees

in fully exercising rights guaranteed by the Act."[111]  CNN failed to establish, as

required by Board and in-circuit precedent, that "'compelling circumstances'

warrant modification" of the historical unit.[112]  (D&O 105.)  Accordingly, the

Board properly applied (D&O 18 n.36,105-07) the presumption favoring historical

units and concluded that the historical NYC and DC bargaining units remain

appropriate.

The Board rejected (D&O 105-06) CNN's theory that CNN employees

should be added to the TVS units.  The Board reasoned (D&O 105) that such an

addition would "deprive [TVS] employees of their statutory rights and at the same

time deprive those who were not members of the TVS bargaining unit of their

rights to decide whether or not they wished to be represented by a [u]nion."

Moreover, as the Board found (D&O 105), CNN's basis for claiming a community

of interest or functional integration among their proposed wall-to-wall units is the

product of the unlawful changes it made to unit employees' employment terms.

Because "CNN cannot be allowed to profit from its illegal conduct aimed at

---

[110] *Trident Seafoods, Inc. v. NLRB*, 101 F.3d 111, 114 (D.C. Cir. 1996) (citations omitted); *accord Dodge of Naperville, Inc.*, 796 F.3d at 38.

[111] *Trident Seafoods*, 101 F.3d at 114.

[112] *See e.g.*, *Dodge of Naperville*, 796 F.3d at 39.

dilution of the bargaining unit[,]"[113] the Board properly rejected (D&O 105-06) the asserted wall-to-wall units.[114]  Furthermore, as this Court recognizes, a unit need only be appropriate, not the most or only appropriate unit.[115]  Therefore, even if the wall-to-wall units are also appropriate, that would not provide a basis for finding the historical units inappropriate.

CNN faults (Br. 63-64) the Board for not addressing the cases it cited, including *KJAZ Broadcasting Co.*[116] and *WLNE –TV*,[117] "in which wall-to-wall units were held to be the only appropriate units for production staffs of broadcast companies."  Those cases are inapposite.  They involved fact-specific findings that the employers demonstrated that larger-than-petitioned-for groups of *previously unrepresented* employees shared a community of interest.  Significantly, they did not involve presumptively appropriate historical units that required compelling circumstances to overcome their appropriateness and no unfair labor practices

---

[113] *Comar, Inc. v. NLRB*, 111 F. App'x 1, 2 (D.C. Cir. 2004); *Dodge of Naperville*, 796 F.3d at 40 (upholding Board's finding that "it would be unfair to permit [the employer] to benefit from the uncertainty created by its unlawful refusal to bargain").

[114] *Bremerton Sun Publ'g Co.*, 311 NLRB 467, 470 (1993); *accord Bay Shipping Corp.*, 263 NLRB 1133, 1140 (1982) (employer "simply did not have the right" to unilaterally rename "as nonunion" work previously performed by unit employees), *enforced* 721 F.2d 187 (7th Cir. 1983).

[115] *Serramonte Oldsmobile v. NLRB*, 86 F.3d 227, 236 (D.C. Cir. 1996) ("Board need only select *an* appropriate unit, not *the most* appropriate unit") (emphasis in original).

[116] 272 NLRB 196 (1984) (radio station).

[117] 259 NLRB 1224 (1982) (local television station).

shaped the purported communities of interest there.  Moreover, even if those cases were somehow instructive generally, in successorship cases "a historical unit will be found appropriate if the predecessor employer recognized it, even if the unit would not be appropriate under Board standards if it were being organized for the first time."[118]

        **2.**      **CNN was not entitled unilaterally to set initial terms and conditions of employment because it discriminated against hiring its predecessor's employees**

A successor employer normally need not bargain with a union before setting initial terms and conditions of employment.[119]  However, the Board held (D&O 21) that CNN was not entitled to take such unilateral action because of its discriminatory refusal to hire TVS employees.  This holding follows longstanding Board precedent,[120] which this Court has approved.[121]  Where an employer discriminatorily refuses to hire the predecessor's employees, it is impossible to know whether, absent such discrimination, it would have met this requirement.  Because this uncertainty is the result of the employer's wrongful action, it is properly resolved against the employer.[122]

---

[118] *Trident Seafoods*, 101 F.3d at 118.

[119] *See Burns Sec. Servs.*, 406 U.S. at 294-95.

[120] *See Love's Barbeque Rest.*, 245 NLRB 78, 82 (1979), *enforced in relevant part sub nom. Kallmann v. NLRB*, 640 F.2d 1094, 1102-03 (9th Cir. 1981).

[121] *See Capital Cleaning*, 147 F.3d at 1008.

[122] *See generally, Advanced Stretchforming*, 323 NLRB at 531.

CNN first defends against the application of those principles, by disputing that it discriminated against TVS applications; those claims were shown to be meritless (pp. 53-64). Second, it contends (Br. 49-50) that an unlawful motive to avoid a successor bargaining obligation cannot be shown where a successor ultimately "hired so many union members that [it] exposed itself to a bargaining obligation" in the original units. The Board correctly found (D&O 18 n.36) *U.S. Marine Corp.*,[123] instructive in rebutting that defense. There, the successor falsely projected that its future workforce would be twice the size of the predecessor's bargaining unit and, based on this "false full-complement projection," rehired a majority of the predecessor's employees but stopped at the point that they would become a majority of its enlarged "fabricat[ed]" bargaining unit.[124] The Board found that the employer's failure to rehire its predecessor's remaining employees "was a necessary and integral part of [its] attempt to avoid an obligation to recognize and bargain with the Union" and violated Section 8(a)(3) and (1).[125]

Like the employer there, CNN tried to manipulate the unit to dilute the Union's majority. While CNN did not falsely project expansion of the bargaining unit, it speciously contended, contrary to the record and well-settled precedent,[126]

---

[123] 293 NLRB 669, 670 (1989), *enforced*, 944 F.2d 1305 (7th Cir. 1991) (en banc).
[124] *Id.* at 671.
[125] *Id*.
[126] *Trident Seafoods*, 101 F.3d at 118; *Banknote Corp. of Am. v. NLRB*, 84 F.3d 637, 647 (2d Cir. 1996).

that the only appropriate unit was a larger "wall-to-wall" unit consisting of the
TVS employees plus a greater number of its own nonunionized production
employees that would be added into the unit.  But, as shown above (pp. 65-68),
CNN failed to overcome the presumption that favors maintaining historical units
and, moreover, the only basis for the claimed communities of interest in the wall-
to-wall units was the result of its unilateral changes.  Given those circumstances,
the Board reasonably found that CNN conducted its hiring process in the same
discriminatory manner as in *U.S. Marine*, to ensure that the number of TVS
employees that it hired would not constitute a majority of the larger units that it
claimed appropriate.  Ultimately, CNN tried to dilute the majority by making
unilateral changes to justify a larger unit and failing to hire TVS employees.  It
cannot now negate its discriminatory scheme by claiming that it hired a majority in
the smaller units found appropriate.

## IV.  THE BOARD ACTED WITHIN ITS BROAD REMEDIAL DISCRETION IN ISSUING ITS ORDER

### A.  The Board Properly Ordered CNN To Reinstate Terminated TVS Employees and Restore Their Employment Terms

A remedial order's purpose is to restore the status quo that would have
existed absent the unfair labor practices.[127]  The Board's "broad authority" to

---

[127] *See Regal Cinemas, Inc.*, 317 F.3d at 315 ("[T]his court has recognized restoration as a presumptively valid remedy where the employer violates its duty to bargain.").

70

remedy unfair labor practices is "subject only to limited judicial review."[128]  When a joint employer terminates employees without bargaining, reinstatement at the employment terms that existed when that employer acted unlawfully is an appropriate remedy.[129]  Additionally, a successor that discriminatorily fails to hire its predecessor's employees must reinstate them at prior employment terms.[130]  Restoration of the status quo is inappropriate only when it "would require a substantial outlay of new capital or otherwise cause undue financial hardship."[131]

Accordingly, the Board ordered CNN to reinstate the TVS employees and make them whole.  (D&O 24-25.)  The Board explicitly left to subsequent compliance proceedings the issue of whether changed circumstances since the hearing rendered restoration inappropriate.[132]  (Reconsid.Ord. 1.)  Courts have approved restoration orders in similar circumstances.  For instance, this Court has affirmed reinstatement of employees at their previous employment terms, even

---

[128] *Great Lakes Chem.*, 967 F.2d at 629; *Virginia Elec. & Power Co. v. NLRB*, 319 U.S. 533, 540 (1943) (Board's remedy "should stand unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act.")

[129] *See G. Heileman Brewing Co.*, 879 F.2d at 1534 (7th Cir. 1989).

[130] *See also Daufuskie Island Club & Resort, Inc.*, 328 NLRB 415, 424 (1999), *enforced sub nom. Int'l Union of Oper. Eng. v. NLRB*, 221 F.3d 196 (D.C. Cir. 2000) (ordering reinstatement and make-whole remedy for 108 employees).

[131] *Teamsters Local No. 171 v. NLRB*, 863 F.2d 946, 957-58 (D.C. Cir. 1988).

[132] The Board first resolves liability in the unfair-labor-practice proceeding, and then, in a compliance proceeding, resolves the specifics of the remedy such as the amount of money actually due.  *See, e.g.*, *NLRB v. Katz's Delicatessen of Houston Street, Inc.,* 80 F.3d 755, 771 (2d Cir. 1996).

when reinstatement requires hiring a redundant set of employees.[133]  Likewise, in

*G. Heileman Brewing*, where a joint employer unlawfully terminated several

employees when it cancelled a subcontract, the Seventh Circuit enforced

reinstatement at the terms in the subcontractor's expired collective-bargaining

agreement.[134]  Here, the Board chose its traditional remedy of ordering CNN to

rescind the unilateral changes and reinstate unit employees.  As discussed below,

CNN's challenges to this presumptively valid remedy do not warrant overturning

the Board's order.

### B.    CNN Has Not Met Its Heavy Burden of Showing That the Board Abused Its Broad Remedial Discretion

CNN wrongly contends (Br. 66-73) that the Board's Order contravenes this

Court's precedent, imposes an undue burden while ignoring the Board's standard

practice of deferring such issues to compliance proceedings, and is contrary to the

First Amendment, which it reads to prohibit almost any regulation of a news

organization's employment relationships.  Those arguments should be rejected.

First, CNN cites (Br. 66-68) *Capital Cleaning Contractors, Inc. v. NLRB*, to

show that the Board must end its make-whole liability for contractual benefits at

the point the parties would have reached agreement or impasse.[135]  Until recently,

the Board, under *Planned Building Services, Inc.*, allowed successors, who

---

[133] *Regal Cinemas, Inc.*, 317 F.3d at 315.

[134] 879 F. 2d at 1534.

[135] 147 F.3d 999 (1998).

unlawfully refused to hire a predecessor's employees, to present evidence in *compliance* proceedings that they would not have agreed to the predecessor's employment terms.[136]  CNN states, with no authority, that the same rule applies to joint employers.  Neither this Court nor the Board, however, has ever applied the *Capital Cleaning* or *Planned Building Services* limitation to joint employers.  The limitation purports to prevent an employer from being "required to accept contractual terms to which it did not agree."[137]  But as a joint employer, CNN employed TVS employees *when the contract terms were still in effect*.  CNN is therefore "obligated to maintain the status quo [under] the contracts, until bargaining to agreement or impasse."  (D&O 17 n.35.)  Contrary to CNN's argument (Br. 67) that this requirement limits its liability, "this is a case in which the employer has refused to bargain, making continuing liability an appropriate remedy."[138]  CNN could not legally set initial terms and conditions of employment even absent its discrimination in hiring, because "[a] joint employer is subject to the statutory duty to bargain."[139]  *Capital Cleaning* does not speak to the situation here.

---

[136] 347 NLRB 670, 676, 678 (2006), *overruled in Pressroom Cleaners*, 361 NLRB No. 57 (Sept. 30, 2015).

[137] 147 F.3d at 1012.

[138] *G. Heileman Brewing*, 879 F.2d at 1534.

[139] *Centra, Inc.*, 954 F.2d at 370.  The Sixth Circuit applies the *Capital Cleaning* limitation.  *See Capital Cleaning*, 147 F.3d at 12.  The order enforced in *Centra*, however, contains no such limitation on the backpay obligations of the joint

CNN further contends (Br. 68-71) that the Board's reinstatement remedy imposes an undue burden.  But the Board has explicitly deferred this issue to compliance proceedings for any evidence not available at trial.  (Reconsid.Ord. 1.) CNN's only challenge (Br. 68 n.9) to this reasonable exercise of the Board's discretion is that "it is appropriate at this stage for the Court to review the burdens that any wide-scale rehiring would impose."  But in *Great Lakes Chemical*, cited by CNN, this Court rejected a similar challenge as "premature" and enforced a Board order because "[a]ny recognized defense to the order's implementation can be raised" in compliance proceedings.[140]

The record does not support CNN's further claim (Br. 69) that its operations "evolved" between 2003 and the 2008 trial to render reinstatement an undue burden as of the record's closing.  CNN produced no credited evidence that its operations had changed in any meaningful way other than through its unlawful removal of bargaining unit work.  When CNN made the changes in question, it "continued its newsgathering, production, and broadcasting operations at the two bureaus uninterrupted."  (D&O 15.)  It is undisputed that TVS employees adapted to many changes between 1980 and 2003, and the Board found (D&O 19,123) no evidence that they could not do so again with the training new BSP hires received.

---

employer, even though, as here, the joint employer later became the sole successor employer.  *See D & S Leasing*, 299 NLRB at 663.
[140] 967 F.2d at 629-30.

Therefore, CNN did not meet its heavy burden of showing based on the trial record, that the Board's order restoring the status quo is an undue burden and cannot be enforced.[141]

Finally, the First Amendment does not bar restoration. An order reinstating news employees to remedy unlawful action "nowise circumscribes the freedom of the press."[142] CNN cites *Passaic Daily News v. NLRB*, to show that the Board cannot order reinstatement.[143] But, there, this Court approved reinstatement of a newspaper employee, except for the "language mandating the publication of [the employee's] column."[144] Here, the Board, consistent with *Passaic Daily News*, has not included any language requiring CNN to broadcast anything specific or, contrary to CNN's supposition (Br. 72), prohibiting the use of affiliate footage.

## C.      Changed Circumstances Do Not Invalidate the Board's Affirmative Bargaining Order

Citing *Flamingo Hilton-Laughlin v. NLRB*, CNN contends that the Board must give "due consideration" to the passage of time before ordering it to bargain.[145] But *Flamingo* involved a Board order to bargain with a union that had never represented the employees in question. Here, the Board's Order restores a longstanding bargaining unit. The Board noted that, even under CNN's

---

[141] *Teamsters Local No. 171*, 863 F.2d at 957-58.
[142] *Assoc. Press v. NLRB*, 301 U.S. 103, 133 (1937).
[143] 736 F.2d 1543 (D.C. Cir. 1984).
[144] *Id*. at 1559.
[145] 148 F.3d 1166, 1173   (D.C. Cir. 1998).

projections, 86 of the 108 DC unit members and 125 out of 175 in NYC would have been employed by CNN absent its unlawful actions.  (D&O 102.)  And any uncertainty about how many TVS employees would have remained in the unit, absent CNN's violations, must be resolved against it as the wrongdoer.[146] Moreover, "employee turnover by itself does not lead to a presumption that a union has lost majority support among the workers."[147]  The Order only requires bargaining and bars union decertification for a reasonable period of time, which is necessary to ensure that the employees have an adequate opportunity to exercise their Section 7 right to seek a collective-bargaining agreement.  Given its wide-ranging violations to oust the unionized employees and preclude their return, CNN can hardly assume a role as guardian of employees' Section 7 rights.[148]

---

[146] *See NLRB v. Staten Hotel Ltd. Partnership*, 101 F.3d 858, 862 (2d Cir. 1996).

[147] *Western Temp. Servs., Inc.*, 821 F.2d at 1270.

[148] *See Auciello Iron Works, Inc. v. NLRB*, 517 U.S. 781, 790 (1996) ("The Board is accordingly entitled to suspicion when faced with an employer's benevolence as its workers' champion against their certified union, which is subject to a decertification petition from the workers if they want to file one.").

## CONCLUSION

The Board respectfully requests that the Court enter a judgment enforcing

the Board's Order in full and denying the petition for review.


Respectfully submitted,

/s/ Joan E. Hoyte

JOAN E. HOYTE
*Supervisory Attorney*

National Labor Relations Board
1015 Half Street SE
Washington, DC 20570-0001
(202) 273-1793




RICHARD F. GRIFFIN, JR.
*General Counsel*

JENNIFER ABRUZZO
*Deputy General Counsel*

JOHN H. FERGUSON
*Associate General Counsel*

LINDA DREEBEN
*Deputy Associate General Counsel*

April 2016

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| NATIONAL LABOR RELATIONS BOARD | * | |
| | * | |
| Petitioner/Cross-Respondent | * | |
| | * | |
| and | * | Nos. 15-1112, |
| | * | 15-1209 |
| NATIONAL ASSOCIATION OF BROADCAST | * | |
| EMPLOYEES AND TECHNICIANS - | * | |
| COMMUNICATIONS WORKERS OF AMERICA, | * | |
| LOCAL UNION NO. 11; NATIONAL ASSOCIATION | * | Board Case Nos. |
| OF BROADCAST EMPLOYEES AND | * | 05-CA-031828, |
| TECHNICIANS - COMMUNICATIONS WORKERS | * | 05-CA-033125 |
| OF AMERICA, LOCAL UNION NO. 31 | * | |
| | * | |
| Intervenors | * | |
| | * | |
| v. | * | |
| | * | |
| CNN AMERICA, INC. | * | |
| | * | |
| Respondent/Cross-Petitioner | * | |

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), the Board

certifies that its brief contains 16,970 words of proportionally-spaced, 14-point

type, the word processing system used was Microsoft Word 2010, and the PDF file

submitted to the Court has been scanned for viruses using Symantec Endpoint

Protection version 12.1.6 and is virus-free according to that program.

/s/ Linda Dreeben
Linda Dreeben
Deputy Associate General Counsel
National Labor Relations Board
1015 Half Street, SE
Dated at Washington, DC              Washington, DC 20570
this 8th day of April, 2016           (202) 273-2960

## ADDENDUM OF STATUTES AND RULES

**Relevant provisions of the National Labor Relations Act (29 U.S.C. § 151, et seq.) are as follows:**

**Section 7** [29 U.S.C. § 157] Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection….

**Section 8** [29 U.S.C. § 158] (a) It shall be an unfair labor practice for an employer-

> (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title.
>
> . . . .
>
> (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: *Provided*, That nothing in this subchapter, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in this subsection as an unfair labor practice) to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later, (i) if such labor organization is the representative of the employees as provided in section 159(a) of this title, in the appropriate collective-bargaining unit covered by such agreement when made, and (ii) unless following an election held as provided in section 159(e) of this title within one year preceding the effective date of such agreement, the Board shall have certified that at least a majority of the employees eligible to vote in such election have voted to rescind the authority of such labor organization to make such an agreement: *Provided further*, That no employer shall justify any discrimination against an employee for nonmembership in a labor organization (A) if he has reasonable grounds for believing that such membership was not available to the employee on the same terms and conditions generally applicable to other members, or (B) if he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the employee

i

to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership;

. . . .

(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title.

. . . .

## Section 10 [29 U.S.C. § 160]

(a) The Board is empowered, as hereinafter provided, to prevent any person from engaging in any unfair labor practice (listed in section 8) affecting commerce. This power shall not be affected by any other means of adjustment or prevention that has been or may be established by agreement, law, or otherwise: *Provided*, That the Board is empowered by agreement with any agency of any State or Territory to cede to such agency jurisdiction over any cases in any industry (other than mining, manufacturing, communications, and transportation except where predominately local in character) even though such cases may involve labor disputes affecting commerce, unless the provision of the State or Territorial statute applicable to the determination of such cases by such agency is inconsistent with the corresponding provision of this Act or has received a construction inconsistent therewith.

. . . .

(e) The Board shall have power to petition any court of appeals of the United States, or if all the courts of appeals to which application may be made are in vacation, any district court of the United States, within any circuit or district, respectively, wherein the unfair labor practice in question occurred or wherein such person resides or transacts business, for the enforcement of such order and for appropriate temporary relief or restraining order, and shall file in the court the record in the proceeding, as provided in such 2112 of title 28, United States Code. Upon the filing of such petition, the Court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction of the proceeding and of the question determined therein, and shall have power to grant such temporary relief or restraining order as it deems just and proper, and to make and enter a decree enforcing, modifying and enforcing as so modified, or setting aside in whole or in part the order of the Board. No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances. The findings of the Board with respect to

questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive. . . . Upon the filing of the record with it the jurisdiction of the court shall be exclusive . . . .

(f) Any person aggrieved by a final order of the Board granting or denying in whole or in part the relief sought may obtain a review of such order in any United States court of appeals in the circuit wherein the unfair labor practice in question was alleged to have been engaged in or wherein such person resides or transacts business, or in the United States Court of Appeals for the District of Columbia, by filing in such court a written petition praying that the order of the Board be modified or set aside. A copy of such petition shall be forthwith transmitted by the clerk of the court to the Board, and thereupon the aggrieved party shall file in the court the record in the proceeding, certified by the Board, as provided in section 2112 of title 28, United States Code. Upon the filing of such petition, the court shall proceed in the same manner as in the case of an application by the Board under subsection (e) of this section, and shall have the same jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper, and in like manner to make and enter a decree enforcing, modifying and enforcing as so modified, or setting aside in whole or in part the order of the Board; the findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall in like manner be conclusive.

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| NATIONAL LABOR RELATIONS BOARD | * | |
| | * | |
| Petitioner/Cross-Respondent | * | |
| | * | |
| and | * | Nos. 15-1112, |
| | * | 15-1209 |
| NATIONAL ASSOCIATION OF BROADCAST | * | |
| EMPLOYEES AND TECHNICIANS - | * | |
| COMMUNICATIONS WORKERS OF AMERICA, | * | |
| LOCAL UNION NO. 11; NATIONAL ASSOCIATION | * | Board Case Nos. |
| OF BROADCAST EMPLOYEES AND | * | 05-CA-031828, |
| TECHNICIANS - COMMUNICATIONS WORKERS | * | 05-CA-033125 |
| OF AMERICA, LOCAL UNION NO. 31 | * | |
| | * | |
| Intervenors | * | |
| | * | |
| v. | * | |
| | * | |
| CNN AMERICA, INC. | * | |
| | * | |
| Respondent/Cross-Petitioner | * | |
| | * | |

## CERTIFICATE OF SERVICE

I hereby certify that on April 8, 2016, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.

I certify that the foregoing document was served on all those parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not by serving a true and correct copy at the addresses listed below:

Kevin Taylor Baine
Kannon K. Shanmugam
Paul Mogin
John S. Williams
Williams & Connolly LLP
725 12th Street, NW
Washington, DC 20005

Barry Peek
Patricia McConnell
Meyer, Suozzi, English & Klein, P.C.
1350 Broadway, Suite 501
New York, NY 10018-0026

Maurice Baskin
Michael Joseph Lotito
Elizabeth Parry,
Littler Mendelson PC
815 Connecticut Avenue, NW, Suite 400
Washington, DC 20006

Zachary D. Fasman
Proskauer Rose LLP
Eleven Times Square
New York, NY 10036-8299

Keith R. Bolek
O'Donoghue & O'Donoghue LLP
4748 Wisconsin Avenue, NW
Washington, DC 20016-0000

/s/Linda Dreeben
Linda Dreeben
Deputy Associate General Counsel
National Labor Relations Board
1015 Half Street, SE
Washington, DC 20570
(202) 273-2960

Dated at Washington, DC
this 8th day of April, 2016